From our point of view, it only remains for us to affirm the judgment.

For reasons assigned, it is affirmed.

MONROE, J., dissents.

———

(36 South. 974.)

No. 14,421.

VOIERS v. ATKINS BROS.

(Nov. 16, 1903.)

VENDOR AND PURCHASER—SALE—NOTARIAL ACT — DESTRUCTION — REINVESTMENT OF TITLE— POSSESSOR IN BAD FAITH—IMPROVEMENTS— EXPENSES.

1. Where A. sells B. certain property by notarial act, which B. resells to A. by notarial act, the last vendor cannot, by not recording the last act of sale, and destroying it, reinvest himself in the ownership of the property by means of parol evidence that the second vendee had consented verbally to a rescission of the sale to her.

2. The judgment of the district court in favor of the defendant against the plaintiff, a married woman, is reversed on the ground that the account upon which the defendant declared was due by the husband, and not the wife.

On Rehearing.

3. The possessor in bad faith is entitled to recover from the owner of the soil only for those improvements of which the owner may order the removal. He cannot recover for ditching, clearing land, and other improvements inseparable from the soil. It makes no difference how much the value of the land has been enhanced thereby. In such a case the principle by which one man is not permitted to enrich himself at the expense of another has no application.

4. This does not apply to expenses incurred in the preservation of the property, and does not prevent a possessor in bad faith from offsetting the claim of the owner against him for fruits and revenues, by a claim on his part for expenses incurred in useful improvements upon the property to the extent that the owner is benefited thereby.

(Syllabus by the Court.)

Appeal from Eleventh Judicial District Court, Parish of Natchitoches; Charles V. Porter, Judge.

Action by Mrs. A. M. Voiers against Atkins Bros. From the judgment both parties appeal. Modified.

Scarborough & Carver and Chaplin, Breazeale & Chaplin, for plaintiff. Alexander & Wilkinson, for defendants.

## Statement of the Case.

NICHOLLS, C. J. Plaintiff alleged that she was the owner of a certain described plantation in the parish of Natchitoches, which she bought in her paraphernal right from J. A. Prudhomme et al. on the 21st of November, 1897.

That in the fall of 1898 her husband, J. R. Voiers, being indebted to Atkins Bros., a mercantile firm composed of John B. Atkins and James W. Atkins, to the extent of about $7,000 or more, the said Atkins Bros., for the fraudulent purpose of collecting said debt from petitioner, persuaded her said husband to agree that he would procure petitioner to give to said Atkins Bros. a mortgage and vendor's privilege on her said separate paraphernal property as security for said debt.

That in pursuance of said agreement her husband began to importune her to pass a deed to Atkins Bros. of her said plantation, and then to purchase same back from them, which process it was thought would give them the security which they wished, and to which petitioner's husband had agreed. That she for a week or more refused to assent to such an agreement, but in the course of time, being unable to resist the entreaties, persuasions, threats, and marital influence of her husband, she finally yielded a reluctant consent, whereupon the following documents were signed on December 15, 1899,

by her and her husband and the Atkins Bros. before S. J. McMillan, notary public in and for Red River parish, La., the said McMillan being also the bookkeeper of the Atkins Bros., namely:

(1) An act purporting to be a sale of said plantation from herself to the said Atkins Bros., the consideration thereof being falsely recited as the sum of $6,000 cash, whereas in truth and in fact not one cent was paid to her either at the time of the sale, or before, or since. (2) An act purporting to be a retrocession of the same property from Atkins Bros. to her, the recited consideration being five notes, as follows, all dated December 19, 1898, all bearing 8 per cent. per annum interest from maturity: One due January 1, 1900, for $1,680; one due January 1, 1901, for $1,584; one due January 1, 1902, for $1,488; one due January 1, 1903, for $1,392; and one due January 1, 1904, for $1,296; which notes were turned over by the notary to Atkins Bros., who kept the same in their possession for a year or more, and then, without any explanation whatever, handed the same to her husband, the said J. R. Voiers.

That Atkins Bros. took the so-called "act of retrocession" and locked it up in their safe in Lake End, La., promising in a few days to send it to the recorder of Natchitoches parish to be recorded, but they had never so sent it, . notwithstanding the repeated demands made by her husband and herself.

That while the said five notes, and probably the so-called retrocession also, were dated December 19, 1898, yet in truth and in fact they were all signed simultaneously with the so-called sale of December 15, 1898, and together constituted one transaction.

That the sole purpose, both on her and her husband's part and on the part of Atkins Bros., in executing the acts above mentioned, was to give Atkins Bros. a mortgage and vendor's privilege upon the property of petitioner to secure them for the debt due

them by J. R. Voiers, there being no intention on her part or that of her husband to really sell, or on the part of Atkins Bros. to really buy, the said property.

That this attempt to bind the wife for the husband's debt was an absolute nullity, in contravention of a prohibitory law, and therefore the said acts were null and void in law, and ought to be so declared. That as to about $4,400 of the debt due by J. R. Voiers to the said Atkins Bros. the same was admittedly the husband's debt, and there was no pretense on Atkins' part that petitioner owed the same.

That as to the rest thereof—say $3,273 of the said debt—this was equally the debt of the said J. R. Voiers, and petitioner was not in any way liable for the same, the same having arisen in the following manner, to wit: In June, 1894, the said J. R. Voiers, being indebted to the said Atkins Bros. in the sum of about $3,000, by marital influence and coercion caused petitioner to obtain from the Honorable James Andrews, district judge of her domicile in the parish of Natchitoches, a certificate authorizing her to borrow $3,000 upon mortgage of her separate property, and also caused her to go before H. M. Hyams, notary public in and for the parish of Natchitoches, on the 13th day of June, 1894, and execute a notarial act in which it was falsely declared that she was indebted to Atkins Bros. in the sum of $3,000 for money loaned, whereas in truth and in fact she had not borrowed any money from Atkins Bros., and did not owe them a cent, the transaction being purely an assumption by her of the debt due them by her husband, J. R. Voiers. That as representing said $3,000 she executed her five notes dated June 13, 1894, each for the sum of $600, payable, respectively, on the 20th of February, 1895, 1896, 1897, 1898, and 1899, said notes bearing 8 per cent. from their dates, and secured said notes by a mortgage on her separate paraphernal property. That one of the said notes was sub-

sequently paid by her husband, and the other four, together with interest thereon, made up the sum of $3,273, and this, together with the $4,400 above mentioned, was the debt due by J. R. Voiers to Atkins Bros., which, by the acts of December 15, 1898, it was designed to secure by mortgage and vendor's privilege on petitioner's property.

That as to the said four notes of $600 each, executed in June, 1894, they were in truth and in fact not the debt of petitioner, having been given by her for a debt due by her husband, and the effort of petitioner thus to assume said debt and give a mortgage therefor was in contravention of a prohibitory law, and therefore void. That the nullity of the same can be pleaded by petitioner, and the judge's certificate is no bar thereto, for the reason that no money or other value was put out by Atkins Bros. on the faith of said certificate, but the said notes and mortgage were given simply and solely to cover an antecedent debt due to said Atkins Bros. by petitioner's husband, which did not inure to petitioner's benefit, and this the said judge's certificate did not and could not authorize. That petitioner and husband remained in possession of the said plantation and lived on the same for the year 1899, her husband renting most of the same out in small pieces; ano that, in order to further secure her husband's said debt, he turned the notes taken for said rent, amounting to $1,000, to Atkins Bros., who collected the same, and therefore owe petitioner the amount thereof, said notes being petitioner's property.

That some time after the ostensible sale and retrocession were passed it was discovered that instead of 150 acres, as called for by the title papers, the plantation really contained 400 acres, whereupon the Atkins Bros., not content with defrauding petitioner by making her pay her husband's debt, conceived the purpose of defrauding her out of the plantation altogether; the opportunity to do so existing by reason of the nonregistry of the so-called retrocession.

That, in order to get possession of the plantation for the execution of this purpose, the Atkins Bros., on or about January 1, 1900, induced petitioner and her husband to leave the same and move up to Lake End, by holding out a seductive scheme by which they represented that petitioner's husband could make a large amount of money keeping a boarding house.

That petitioner's husband thereupon rented out the plantation, and turned over the rent obligations for that year, amounting to $1,500, to Atkins Bros., as additional security on the debt due them by her husband. That Atkins Bros. collected said $1,500 rents, and therefore owed same to petitioner, said notes being petitioner's property. That after running the boarding house a year, petitioner's husband saw that he could make nothing at it, and thereupon wished to move back on the plantation, but this Atkins Bros. would not permit, saying that they had rented out the property for 1901, and that the dwelling house on same was occupied. That the Atkins Bros. are responsible to petitioner for the rent of said plantation for the year 1901, which is reasonably worth $1,500, and a like amount per year for every year that petitioner was kept out of her property.

That she was entitled to 5 per cent. per annum interest on all said rents from the end of each year for which they were respectively collected.

That the Atkins Bros. had cut from the woodland on said plantation fully $1,500 worth of timber,' for which amount they were also responsible to petitioner, with 5 per cent. interest from judicial demand. That under the facts above stated petitioner was entitled to recover her plantation, together with the rents and pay for timber cut free from any claim of defendants. That, should the court conclude she was legally

bound for any of the debt due defendants, and that the mortgage was valid to any extent, yet she was still entitled to recover the plantation, rents, and pay for timber cut.

Petitioner prayed for service and citation of John B. Atkins and James W. Atkins, and, after trial had, for judgment decreeing petitioner the owner of the plantation described, and entitled to the possession thereof, free from any mortgage or other claim on part of defendants, for further judgment decreeing the act purporting to be a sale by her to Atkins Bros. of said plantation to be an absolute nullity, and the mortgages given Atkins Bros. also nullities, and for moneyed judgment against John B. Atkins and James W. Atkins in solido for the sum of $1,500 for timber cut, with 5 per cent. per annum interest thereon from judicial demand, and for the further sum of $1,000 for rent of 1899, and $1,500 per annum rent of the said property for the years 1900 and 1901, and the same amount per year as long as petitioner was kept out of possession thereof, with 5 per cent. per annum interest on said amounts from the end of each year, and for cost and general relief.

Defendants answered, pleading, first, the general issue. They admitted their purchase and possession of the property described, but averred that they purchased same from the plaintiff, she being separate in property from her husband, and having the sole and exclusive administration and management of said property; and that the purchase price of said property was paid to said plaintiff at the time by applying the proceeds of said sale to the account and notes due them by the said plaintiff, Mrs. Voiers.

That the said notes were executed for money loaned and goods advanced to her from time to time for her own separate use and that of her separate estate, she being previously duly authorized to contract said loan and execute said notes secured by mortgages on her separate and paraphernal property described in her petition by the judge of the said court. That the proceeds of said loan inured to her separate benefit, and to the benefit of her separate estate, under her separate administration and control, a part of which being used by her toward paying the purchase price of said property and in making improvements thereon, the balance being used by her in administering said property and in paying the family expenses, she being separate in property from her husband, he being wholly insolvent, without any visible means at all.

That the account which was partially paid by the proceeds of said sale was for money, goods, wares, and merchandise sold and delivered to plaintiff to enable her to improve and administer her said separate property, which was under her exclusive control and administration, and to pay the family charges of plaintiff, her husband owning no property; all of which inured to the separate and exclusive benefit of plaintiff and her separate paraphernal estate.

That the plaintiff administered separately said property, and the acts of her husband with reference thereto were done as her agent, and in her name; and that the credit was extended to plaintiff solely. Although the accounts on the books of defendant were kept in the name of J. R. Voiers, no credit was extended to him, nor was he considered or treated as the debtor of defendant. That the entire proceeds of sale of said property were used at plaintiff's instance and request in liquidating pro tanto her separate and paraphernal indebtedness to them, and that the price paid for said property was exorbitant at the date of said purchase. That they had the exclusive possession and control of said property since the sale to them, and had made large and valuable improvements thereon, well worth the sum of $5,000 and more, which had greatly enhanced the value of said property, and for which they should have judgment in reconvention

against plaintiff in the event of eviction therefrom.

They specially denied that they collected rents therefrom in the year 1899, and but a small amount for the year 1900. They averred that said so-called act of retrocession was executed on the date it bears, but at the special instance and request of plaintiff, declaring she did not wish to purchase said property, and relinquished all claims thereto thereunder. They specially denied that plaintiff was coerced or unduly influenced by her husband in the premises, and specially denied that they or either of them defrauded or deceived the plaintiff in any manner whatever. Wherefore they prayed that her demands be rejected at her cost. But in the event of their eviction from said property, then and in that event they prayed for judgment against plaintiff for $5,000, with legal interest from this date, and for such other sum or amount as the court in equity should find them entitled to, and for cost and general relief.

The defendants were permitted to file, over plaintiff's objections, the following exception and plea of estoppel in bar of plaintiff's action:

They averred that in the case of Atkins Bros. (defendants in the present suit) v. D. C. Scarborough, No. 12,291 of the docket of the district court for Natchitoches, plaintiff and her husband voluntarily appeared as witnesses, and then and there testified in substance that said property was the separate property of plaintiff, under her separate control and administration, free from the acts or interference of her said husband, and had continuously so been since 1888, and thereby induced the district court and the Supreme Court of this state to declare, and in effect decide, that said property was at the time of said sale to defendants the separate paraphernal property of plaintiff. That plaintiff, by her evidence in said cause No. 12,291 on the docket of said court, testified to what she had always claimed and represented to defendants when obtaining said supplies, etc., and to now permit her to change her attitude and recover in this case would not only be a fraud on defendants, but on the district court and the Supreme Court of this state as well. That by her conduct and acts she had brought about this state of affairs, and induced defendants to advance her large amounts, and to purchase said property on said representations that said property was under her exclusive control and administration, and the amount to be and that was advanced on said representation was for her own separate use and benefit and that of her separate estate, and she is estopped and debarred from urging the contrary.

That the judgment rendered in the case of Atkins Bros. v. D. C. Scarborough, No. 12,291 on the docket of the district court, being rendered wholly on her and her husband's evidence as to the administration and control of said property, and was a complete bar and res judicata as to her of any rights she might assert contrary thereto, and she was estopped from falsifying the evidence so given on which said judgment was based, and same constituted res judicata of such issue herein involved.

Plaintiff objected to the filing of the plea on the ground that it came too late, and was not admissible at this time of the proceedings. That the allegations did not show that the knowledge that they had obtained upon which they based the plea had only come to them at this time, but, on the contrary, it was shown that they had that knowledge at the inception of plaintiff's suit, the allegations of the petition having placed him on guard.

That they had that knowledge personally (both defendants and their counsel, as the present counsel was the counsel of Atkins Bros. in the suit of Atkins Bros. v. D. C. Scarborough), as Mrs. J. M. Voiers, as a witness in that suit, conferred with them. That by insinuation conveyed in his cross-examina-

tion of Mrs. Voiers counsel conveyed to the court knowledge that all of the evidence and defenses of the Atkins suit and the suppression of the so-called act of retrocession was done with his knowledge, and with his advice, and with consent of his clients, Atkins Bros. That for these reasons plaintiff urged that the plea was not admissible at any time, and especially at this time. That this objection was overruled, and plaintiff's counsel reserved a bill. The document was filed.

The court having overruled the objections, plaintiff excepted to the ruling.

The district court rendered judgment in favor of the plaintiff and against the defendants, decreeing the plaintiff to be the owner of the property described in her petition, and that the act purporting to be a sale of the said property by the plaintiff to Atkins Bros. be, and the same is hereby, declared to be null and void. It is further ordered, adjudged, and decreed that the plaintiff, Mrs. A. M. Voiers, recover from the said defendants, J. B. and J. W. Atkins, rent for the said property at the rate of $1,100 per year, beginning from judicial demand, and running until the said property is delivered into the possession of the plaintiff, together with 5 per cent. per annum interest on said $1,100 from the expiration of each year. It further ordered, adjudged, and decreed that Mrs. A. M. Voiers recover from J. B. and J. W. Atkins the sum of $68.75 for timber cut, together with 5 per cent. per annum thereon from judicial demand.

It further ordered, adjudged, and decreed that defendants recover judgment on their reconventional demand against the plaintiff in the following sum, namely: First. The sum of $6,000, with 8 per cent. per annum interest thereon from judicial demand.

Second. The sum of $2,836.75, value of improvements placed by them on the plantation in question, with 5 per cent. per annum interest thereon from the 1st day of January,

1901, and that they be permitted to retain possession of the property in dispute until this last-named account is paid, the rent already accrued in favor of said plaintiff and to accrue to be credited on this amount, and that costs of this suit be paid by defendants.

Defendants appealed.

## Opinion.

In 1887 J. R. Voiers and Aurore Prudhomme, his wife, were living in the parish of Red River. On the 21st of November, 1887, Mrs. Voiers, then separated in property from her husband, bought from the heirs of John Prudhomme the plantation which is in litigation in this suit for the price of $1,100, payable $300 cash, and the balance represented by four notes—one due January 1, 1889, for $106.06, one due January 1, 1890, for $44.45, and one due January 1, 1891, for $604.45. Two of these notes were canceled in June, 1888, one in July, 1888, and one in August, 1890. Possession of the property was not given until the 1st of January, 1888. The plantation was leased for the years 1888 and 1889 to A. T. Voiers, and to Jackson for the year 1890. Voiers and his wife moved on the place for the first time in January, 1891, at which time, as has been stated, all of those notes had been paid. They lived on the plantation until January, 1900, when they went to Lake End (where defendants were conducting their mercantile business), in order, under a lease made to them in their joint names by defendants, to keep a hotel for them at that place. On the 3d of June, 1894, Judge Andrews, of the Tenth judicial district, signed a certificate that he had in March, 1894, examined at chambers Mrs. Voiers touching the subjects contained in her petition to be authorized to borrow a sum of money not to exceed $3,000 in principal, and to grant a mortgage on her separate estate to secure the payment of the sum to be borrowed, with interest and costs,

and that she had satisfied him that the money she desired to borrow was solely for her separate advantage, and for the benefit of her separate estate described in her petition, and that the sum to be borrowed was not for her husband's debts, nor for his benefit or advantage, nor for the benefit of his separate estate, nor for that of the community.

That he authorized her to contract that loan, and to secure payment of the principal, interest, and costs by a special mortgage on her separate property, particularly described in her petition, and to execute all proper acts for the doing of which the certificate given would be her warrant.

On the 13th of June, 1894, Mrs. Voiers, authorized and assisted by her husband, executed an act before Hyams, clerk of court and ex officio notary for the parish of Natchitoches, in which she acknowledged that she was indebted to Atkins Bros. in the sum of $3,000 for money which she loaned, which said indebtedness was represented by five promissory notes of even date, one for $600, due and payable on the 20th of February, 1895, and four others, for like amounts, payable on the 20th of February, 1896, 1897, 1898, and 1899, bearing 8 per cent. interest per annum from date, payable to the order of Atkins Bros.; and she secured payment of said notes by special mortgage on her separate property, a description of which she had given in her application to the judge for his authorization to borrow money.

In this petition she averred that in the management of her business it had become necessary, and it was to her interest and that of her separate estate, to borrow a sum of money not to exceed $3,000, and that, in order to enable her to effect the loan, it was necessary that she mortgage her separate estate. That the money to be borrowed was for her own separate use and benefit, and for the use and benefit of her separate property, and was not to pay her husband's debts, or for his separate benefit or advantage, or for

the benefit of the community, if any existed. That the money to be borrowed was to be used by her in paying debts heretofore contracted for the benefit of her separate estate, and to pay money she was compelled to borrow to conduct the necessary planting operations for the current year (1894). That all the money borrowed would be used for her own separate benefit, and for the benefit of the real estate described.

On the 15th of December, 1898, Mrs. Voiers, authorized and assisted by her husband, by an act before McMillan, notary public, purported to sell to Atkins Bros. the property which she had mortgaged to them, for the price of $6,000 cash, the receipt of which amount she acknowledged.

By act before McMillan, notary, purporting to have been executed on the 19th of December, 1898, Atkins Bros. reconveyed in the form of a sale this same property to Mrs. Voiers for the sum of $7,400, represented by five notes of the purchaser, payable to the order of the vendors, for different amounts, maturing January, 1900, 1901, 1902, 1903, and 1904, payment of which notes she secured by special mortgage (vendor's privilege being reserved) on the property transferred. Mrs. Voiers and her husband, who had removed from Red River to Natchitoches parish in January, 1891, remained upon the plantation up to January, 1900. They then went to Lake End, where Atkins Bros. were conducting their mercantile business, in order to take charge for them of a hotel at that place. Voiers rented out the plantation for the year 1900 for $1,500, and turned over the rent notes to Atkins Bros. Finding that hotel keeping was unprofitable, they returned to Natchitoches, but not to the plantation, as Atkins Bros. said it was rented for the year 1901, and the dwelling house upon it was occupied. They remained in the town of Natchitoches until March, 1902, when the present suit was instituted, in which the plaintiff seeks to be decreed the owner of the property

involved in this litigation, notwithstanding her apparent sale of the same to the defendants; to have the said act of sale set aside, and also the act of mortgage which she had executed in their favor; to have it decreed that she owed nothing to them; that the claims which they pretend to have had or to have against her be adjudged, if due at all, to be due by her husband, and not by herself. She claims fruits and revenues from the defendants as having been and being possessors in bad faith of her property. The defendants assert ownership of the property, and contingently claim a moneyed judgment against the plaintiffs. It appears from the evidence that the act executed on the 15th day of December, 1898, purporting to be an act of sale of the property from the plaintiff to the defendants, was recorded in the conveyance office of Natchitoches, but that the act of retrocession or retransfer to her was not recorded; that it was held by the notary before whom it was passed. It was produced from his hands duly signed and witnessed on the trial of the case, but with all signatures thereto erased. It is claimed by the defendants that the withholding of this act from record was in compliance with the wishes of the plaintiff, and that the erasure of the names was also made at her instance, under an agreement made between herself and them that the act of retransfer to her should be annulled and set aside as if it had not been made, and that the relations between themselves and to the property should be those which would have resulted (with some slight modifications) had the only act between the parties been the act of sale from the plaintiff to the defendants, evidenced by the notarial act of 15th December, 1898, before McMillan, notary. The reason assigned by defendants for this change was the recognition by the plaintiff that she was so heavily indebted to the defendants that she would never be able to pay the notes which she had executed as evidencing the consideration of the retransfer of the property to her. Defendants' contention is that the effect of the erasure, with plaintiff's consent, of all the names upon the act of retransfer to her, was to place her in the same position which she would have occupied had it never been executed at all; that is to say, leaving the defendants as absolute owners of the property under purchase from her for $6,000.

In the brief filed on behalf of the defendants their counsel say:

"It is freely conceded that the act of sale to Atkins Bros. on December 15, 1898, did not express the intention of the parties then, but it did express their intention in 1899, when it was agreed there should be no retrocession.

"We concede it was intended to give only a mortgage and vendor's privilege at the date of the execution of the act. It is shown, we believe, by an overwhelming preponderance of the evidence, that this intention was afterwards changed. The evidence is parol, but it was received without objection being made, but was admissible anyway. These parties having made a new agreement, which was correctly set forth in the act of sale of December 15, 1898, already passed and of record, what impediment existed to permitting the written act to stand?

"What reason was there to execute a new act, which would have been word for word with the one already executed except in date? The agreement between the parties as to the thing and the price consummated the act of sale, and the act of sale was intended and was only evidence of the agreement. If the parties agreed, as the evidence shows, that the act of retrocession should be canceled and destroyed, it was a matter purely between them. It was never recorded. They both knew there was a document of record which did purport to transfer the land, and, when they agreed to do what it purported to, the property was irrevocably vested in the defendants. The evidence of what they agreed to was in written notarial form, and already extant on the record, and we cannot see why anything more was needed, or why a new act should have been passed. It would have been vain and useless. The law did not require it. It was not proving title to real estate by parol. It was proving a subsequent agreement which coincides with the written act. Plaintiff attempted to show that the act of record did not contain the true agreement between the parties, and defendants have shown that, while it did not at that time express their true intent, it did embody the real and final agreement between the parties."

The district judge, in his reasons for judgment, deals with this branch of the case in the following language:

"The question of title to the property in dispute is the one which naturally presents itself first for determination. It is a fact alleged by the plaintiff, and practically admitted by the defendants, that the so-called sale from the plaintiff to the defendants of date December 15, 1898, did not express the real intention or purpose of the parties to it. Mrs. Voiers did not intend to sell, nor did Atkins Bros. intend to buy. J. D. Atkins says (Evidence, page 85): 'I told her [Mrs. Voiers]—in the conversation I told her—that I had no desire to dispossess her of the property, but I wanted my money safe.' This deed, no matter what its form, was not and could not be a sale, because it wanted an essential element of such a contract, viz., the consent of the seller to sell and of the buyer to buy."

The contract must not be confounded with the instrument in writing by which it is witnessed. Civ. Code, art. 1762. But, even if the deed in question had been a sale, and had transferred the title from Mrs. Voiers to the defendants, the retrocession by them to her retransferred the title to her, although the latter deed was never recorded. Registry was not necessary as between the parties. It is clear, therefore, that, if Mrs. Voiers' title was ever divested, it was in consequence of the verbal agreement between the parties which was entered into some eight or ten months after the execution of the two deeds just mentioned, whereby she gave the plantation for the debt she owed Atkins Bros. Admitting that, in the absence of objection by plaintiff's counsel, this contract of giving in payment could be established by parol, I find in the record no evidence of the fact that the husband of the plaintiff ever authorized her to make it. On the contrary, Mt. Atkins, one of the defendants, in his testimony (Evidence, page 87), admits that he does not remember whether or not the husband was ever present when the contract between Mrs. Voiers and himself was made. I think this want of authorization by the husband of the wife is fatal to defendants' claim of ownership to the property. Under this view of the case the authorities submitted by defendants' counsel (Edson v. McGraw, 37 La. Ann. 294, 55 Am. Dec. 234) are not applicable. Of the 37 La. Ann. case it is sufficient to say that the contest was between a party who held an unrecorded agreement of sale of certain real estate and an innocent third party, who had purchased the property from the nominal and apparent owner thereof, and recorded his title; and, while I have not had the opportunity to read the decision from the American Decisions (not having access to that work), the syllabus, which is quoted by counsel, indicates that it could not be authority in the case at bar. It is as follows:

"Delivery back of an unrecorded deed into the hands of the grantor with the intention of reverting title will revert the title in the grantor."

Atkins Bros. never had any title to the property, and their act of retrocession could not convey what they never had. They were not the grantors, and, even if Mrs. Voiers had delivered the deed to them (which she did not), it could not revert title in them because Mrs. Voiers' title had never been divested.

We think the conclusions of the court reached on this branch of the case unquestionably correct, as also its reasons for the same, and that the court's judgment decreeing the ownership of the property in litigation to have remained and to still remain in the plaintiff, Mrs. Voiers, the act of sale of said property from her to defendants by the act of December 15, 1898, before McMillan, notary, to the contrary notwithstanding, is correct, and we affirm the same. (See on that subject, Rhodes v. Spear [Kan. Sup.] 65 Pac. 230.) The doctrine of "once a mortgage always a mortgage" is specially applicable in this case. There is no contention in the case that Mrs. Voiers was not the owner in her paraphernal right of the property in litigation. The defendants received the act of mortgage of the same from her as being her property, and this suit is defended upon the ground that they acquired its ownership by purchase from her.

The district court, after decreeing that the property in litigation still belonged to Mrs. Voiers, and decreeing null and void the act of sale from her to the defendants by the act of the 15th of December, 1898, proceeded to an examination of and a decision upon the incidental rights of the parties resulting from the situation as shown by the evidence. It decreed that Mrs. Voiers should recover rent for the plantation at $1,100 a year beginning from judicial demand and running until the property should be delivered to Mrs. Voiers, with legal interest thereon from the expiration of each year, and recover further the sum of $68.75 for timber cut, with legal interest from judicial demand; and that defendants recover from plaintiff on their reconventional demand the sum of $6,000, with 8 per cent. interest from judicial demand, and the further sum of $2,836.70, value of improvements placed by them on the plantation, with legal interest thereon from judicial demand; defendants being permitted to retain possession until the amount due for improvements was paid; the rent already accrued and to accrue to the plaintiff to be credited on the amount. The court declared that it did not feel authorized to decree the amount for which it adjudged plaintiff to be indebted to the defendants to be secured by mortgage in the absence of an alternative prayer to that effect in the answer. Six thousand dollars was the amount fixed in the act of sale of the 15th of December, 1898, as the price of the property declared in that act to have been sold by Mrs. Voiers to defendants, and to have been received in cash. Plaintiffs' counsel complain very much of the conclusions reached by the court as to Mrs. Voiers' liability upon the amount charged against her in the defendants' accounts for supplies. They urge that they were reached by the court by holding plaintiff "estopped" from denying that she was administering the plantation in her own separate interest during the years when

these supplies were furnished by reason of the testimony given by her in the case of Atkins v. Scarborough, 52 La. Ann. 800, 27 South. 134. They say she was not a party to that suit; that she was only a witness; and that the testimony given therein had no relevancy in the present case, as the issues are different.

The district judge disclaims having held Mrs. Voiers "estopped" by having given that testimony. He says that he considered what she had declared as a witness and gave it weight as testimony; nothing more. The ownership of the property involved in this litigation was therein at issue, but between Scarborough, who had seized the property, claiming that it belonged to the husband of Mrs. Voiers, and subject to seizure for his debts, and Atkins Bros., who, though asserting ownership of the same under Mrs. Voiers through the sale which was set aside in this case as not really being a sale, were in reality claiming to be her mortgage creditors for $6,000. Mrs. Voiers testified in that case in support of her ownership. No objection was made to the introduction of the testimony. It was necessary for the purposes of that suit for her to testify as to her separate administration of the property only in so far as that question would affect the issue as to her separate ownership of the property purchased by her; that is to say, up to the payment of the last of the notes which she had given for the same. There is no issue in the present case involving the administration of that property during that particular period.

We see no reason to doubt the truthfulness of her testimony given as to the administration of the property between those dates. The examination of Mrs. Voiers in that case as to the administration of the property was extended by Atkins Bros., and made to cover a space of time entirely uncalled for by the necessities of the situation, and her answers to questions propounded to her in that extended examination are what are now in-

113 LA.—11

voked by the defendants as concluding her. She herself does not gainsay it. She had obtained a separation of property from her husband and a dissolution of the community with the obvious intention of protecting any property acquired thereafter from the pursuit of his creditors. It was necessary, therefore, that her creditors' notes should be paid with revenues derived therefrom while it was under her separate administration. It was easy for this to have been done, as she and her husband were then upon another plantation in the parish of Red River (referred to herein as the "Scapino Property"), which her husband and A. T. Voiers then held under lease. The Voiers property was therefore leased through the husband to outsiders in 1888, 1889, and 1890, unquestionably, we think, in the wife's name. During that period the defendants furnished supplies for the Scapino plantation, their accounts being made in the husband's name. At the termination of that lease the husband owed the defendants nothing. Voiers and his wife moved from the Scapino place to her own plantation in 1891, and defendants continued to furnish supplies. Their accounts continued to be made out in the name of the husband, and they were submitted to him alone. After the property had become securely that of the wife, the situation changed from what it had been before. The wife could with safety permit her husband to cultivate the plantation on his own account, receive the fruits, and apply the same to meet the marriage charges. Such a course was a safer one for her to pursue than to attempt to cultivate it herself. The husband did not, by reason of the judgment of separation of property, cease to be the head of the family, with rights and obligations as such; and there was no legal obstacle to his wife permitting him to have the enjoyment of the property as her husband for his own account, if she thought proper. Parties dealing with him under such circumstances were not warranted in assuming that the property was being superintended by the husband for and on her account, so as to make her personally liable for debts contracted by her husband. Parties knowing the laws of the state relative to the responsibility of married women were bound in common prudence to protect themselves against any claim by the wife that the debts contracted were not hers, but those of the husband. Defendants claim that after the Voiers moved to Natchitoches parish on her own property, a number of interviews took place between themselves and Mrs. Voiers, at some of which her husband was present, in which it was clearly understood between all the parties that the plantation was being cultivated for her own account, but under the superintendence and management of her husband as her agent. The wife denied positively under oath the truthfulness of this statement, and the husband could not testify on the subject. Defendants attempted to prove the agency by statements made by the husband at various times to different parties, but agency cannot be established by declarations of the party asserting an agency, and particularly is this true of declarations made by a husband who cannot himself be made a witness. It is shown beyond a doubt that Mrs. Voiers took no active part in the management or cultivation of the property after she and her husband moved upon it in 1891. The husband hired all the laborers, made all the leases, contracted for all supplies in his own name, recognized and paid all debts. The planting operations of the plantation were so unsuccessful that defendants found themselves at the close of 1893 with a debt due by the husband or the wife of about $3,000. They then took steps to protect themselves by having the wife execute (under authorization of the district judge so to do) a special mortgage on this particular plantation for $3,000.

In the application to the judge, which was written out for her to sign for this purpose,

and which she did sign, she represented that she owned property separate from her husband; that in the management of her business it was to her interest and to the interest of her separate estate to borrow a sum of money not to exceed the sum of $3,000 in principal, but to effect said loan that it was necessary for her to grant a mortgage on her separate estate; that the money to be borrowed was solely for the benefit of her separate estate, and that the sum to be borrowed was not for her husband's debts, nor for his separate benefit or advantage, nor for the benefit of his separate estate; that it was to be used by her in paying debts contracted heretofore by her for the benefit of her separate estate, and to pay money she was compelled to borrow to conduct the necessary planting operations for the present year (1894); that all the money borrowed by her would be used for her separate benefit, and for the benefit of the real estate described.

The district judge granted the authority asked, following the terms of the application. It will be noticed that Mrs. Voiers did not specify the debts which she said she then owed, nor did the judge attempt to recognize or describe them, and that the plantation operations in the future for which the money was to be borrowed were confined to those of the year 1894.

The wife, under this authorization, executed a mortgage in favor of the defendants, in which she acknowledged she was indebted to them in the sum of $3,000 for money which she borrowed, in representation of which she executed her five promissory notes, and secured the same by special mortgage on this property. The truth was that no part of the money the loan of which was declared to be the consideration of these notes was ever paid to her. The notes were given in representation of an indebtedness then due to Atkins Bros. (as she now claims) by her husband, and in representation of moneys and supplies to be thereafter furnished.

Defendants dealt with the husband thereafter as they had before until the date of the sale which is attacked in this suit. During this period the accounts continued to be made out by defendants in the name of the husband, and he continued in the active control of the plantation. The only warrant we see which the defendants had (outside of the conversations which he testified he had had with the wife, and which she denies) for supposing the plantation was being conducted and cultivated by Mrs. Voiers for her own account was the fact that the parties were separated in property; that this particular property belonged to her, and that her husband administered as her agent from 1888 to 1891; and the presumption which they drew from that fact that he would continue to act as her agent thereafter. We do not attach any special significance to the fact, as an acknowledgment of indebtedness, that the sum of $6,000 was declared to be the price of the property involved in this suit in the act of sale executed by Mrs. Voiers on the 15th of December, 1898, and that that amount corresponded nearly with the amount of the outstanding notes held by defendants under the act of mortgage granted by her of an indebtedness to that amount to defendants. The two acts of December, 1898, taken together, were really nothing than a new mortgage granted by her to defendants. Had these acts not been passed, and had defendants sued plaintiff upon the outstanding notes, the situation was such as would have forced upon them the onus of sustaining the liability of Mrs. Voiers upon them, if she had raised an issue as to her indebtedness upon them. We do not think the situation was changed by varying its form. We have said that the accounts as to this plantation stood upon the books of the defendants in the name of the husband. Not only was this the case, but the account for moneys and supplies furnished by defendants for the Prudhomme plantation, which was under lease by plain-

tiff's husband, are included therein in his name, without any attempt to separate the two. The accounts were so blended that, even if Mrs. Voiers were responsible for the debts from the planting operations on her own place, it would be impossible to tell what the amounts due for the same are. We do not see how defendants can pretend that the wife is responsible for the debts resulting from the planting operations upon the Prudhomme plantation. The accounts filed by the defendants include not only plantation supplies, but the amounts due for supplies to Voiers' family and his own personal expenses. Defendants made no attempt to separate these items from the others. Defendants justify doing this on the ground that the husband is insolvent; that he has no property; that all of the property of the married couple belongs to the wife, who has obtained a separation of property; and that under such circumstances the wife is liable, under article 2435 of the Civil Code, which declares:

"The wife who has obtained the separation of property must contribute in proportion to her fortune and to that of her husband both to the household expenses and to those of the education of their children. She is bound to support those expenses alone, if there remains nothing to her husband."

This is one of several articles bearing upon the liability of the wife for household expenses and the education of children.

Article 2389 declares that:

"If all the property of the wife be paraphernal, and she have reserved to herself the administration of it, she ought to bear a proportion of the marriage charges, equal, if need be, to one-half of her income."

Article 2395 is to the effect that:

"Each of the married persons separate in property contributes to the expenses of the marriage in the manner agreed on by their contract; if there be no agreement on the subject, the wife contributes to the extent of one-half of her income."

This last article provides for a case where the married couple have married under a "marriage contract" containing a clause of "separation of property."

The second, by its terms, applies to a case where the wife's property is all paraphernal, and she has reserved to herself the administration of it. If the wife's contentions in this case be true, she has not "reserved to herself the administration of it," but has permitted her husband to take charge of and cultivate it for his own account, in order to apply the fruits to meeting and paying household expenses and the expenses of the education of the children.

Article 2386 declares:

"If there be no community and the paraphernal property of the wife is administered by the husband or by him and the wife indifferently each party enjoys as he chooses that which comes to his hand, but the fruits and revenues which are existing at the dissolution of the marriage belong to the owner of the thing which produced them."

Article 2396 of our Civil Code (article 1539 of Code Napoleon) declares:

"When the wife, who is separate in property, has left the enjoyment of her property to her husband without any procuration, he is not answerable for the fruits, until a demand of them be made by his wife, or, if not made, until the dissolution of the marriage. He is not accountable for the fruits which have been previously consumed."

In the present case the wife urges that she has left the enjoyment of her property to her husband without any procuration, and she never made any demand for them; that by thus turning over the property to her husband to be utilized by himself she complied with all legal obligations with which she might be chargeable by way of supporting the family and educating the children; that the husband cannot be said to have no property when she herself had turned over and left him in the enjoyment of the whole of her property without any procuration to enable him to provide for the family, and third parties have no direct personal action against her. Dalloz and Verge, under article 1539, Code Napoleon, note 1, says:

"Dans le cas prévu par l'article 1539 la femme est censée avoir laissé la disposition des révenues à son mari pour que celui-ci les emploie aux besoins du ménage et le mari est présumé

lorsqu'il sont consommés les avoir employés à cet usage ou en avoir tenu compte pour le surplus de ce qui lui est attribué par la loi."

Laurent, vol. 2 (Contrat de Marriage), No. 278 et seq., deals also with this question of the direct personal liability of the wife for marriage charges.

We cannot agree with the district judge in his conclusion that the defendants took possession of plaintiff's property in good faith. We find no evidence whatever of the wife's consent that they should do so, and we cannot believe that any one could suppose that he could acquire rights either by destroying himself a notarial act or authorizing or directing the notary who has it in his official charge and custody to do so. Heirs of Dohan v. Murdock, 41 La. Ann. 494, 16 South. 131; Railroad Co. v. Sledge, 41 La. Ann. 896, 6 South. 725; Railroad Co. v. Elmore, 46 La. Ann. 1237, 15 South. 701; McDade v. Levee Board, 109 La. 625, 33 South. 628. The notary before whom this notarial act was passed, and who was also defendants' bookkeeper, was not put upon the stand, nor was his absence accounted for. Defendants received the rents of the property for the years 1899 and 1900 from Voiers.

The plaintiff, by leaving the enjoyment of her property to her husband without procuration, deprived herself of the right of holding him answerable to her for the fruits. She cannot, therefore, be held herself liable to the defendants, to whom he has transferred them as a payment pro tanto of his accounts.

Were we to hold that plaintiff is indebted to defendants for improvements, we could not concur in opinion with the district court that the latter would be entitled to detain the property until that indebtedness was paid. The right of detention is a right accorded specially to parties possessing property in good faith. We are now to determine whether the judgment of the district court upon the alternative prayer of the defendants in their demand in reconvention for a personal judgment against the plaintiff can be sustained at all, and, if so, whether the condition of the record is such as to enable us to sustain it for any specific amount. This case resembles in many of its features that of Courrege v. Colgin, 51 La. Ann. 1069, 25 South. 942.

We do not think the judgment of the district court can be sustained unless the testimony given by the plaintiff, Mrs. Voiers, in the Scarborough Case, is of such controlling influence in the present case as to turn the scales of evidence against her as to the facts and circumstances under which the indebtedness claimed against her by the defendants was created. It will be noticed that the testimony was taken after the alleged sale to the defendants, and that no part of the indebtedness claimed as due by the plaintiff prior to the 15th of December, 1898 (the date of the two acts of sale and of retrocession), was predicated upon that testimony. If the testimony is to be given weight, it is not as an estoppel, but, if at all, as an admission of a pre-existing fact.

She was placed then upon the stand as a witness called for Atkins Bros. to break down an attack made upon her ownership of the property on the ground that the credit notes given by her in its purchase were not paid by revenues of property under her separate administration. After it had been shown that the property to which her credit notes were still outstanding had been leased to third parties, who had given their own rent notes, she was asked:

"Q. In whose name were the rent notes taken —your name, or whose?
"A. My own individual name.
"Q. And it was with that money that you paid the balance of the purchase price—the notes that you had given you paid with that money, the rent?
"A. Yes, sir.
"Q. Who paid the taxes on it during that time?
"A. I did, sir.

"Q. Who has paid the taxes all the time since you purchased it?

"A. I have.

"Q. In whose name were the accounts against the place kept?

"A. Kept against me.

"Q. In whose name was the cotton sold that was raised on the place?

"A. Went to pay the advances."

It will be seen that the examination directed originally to the situation at the time when her purchase notes were outstanding shifted suddenly, so as to include the words, "all the time since you purchased it," and "since you purchased it."

We do not give to the answers the full scope and force which defendants claim for them. A woman upon the stand, with her attention concentrated upon the situation of affairs up to the time of the payment of her notes, could well understand the words "all the time since you purchased it" and "since you purchased it" to refer to all the three years since she had purchased it. If these answers are to be held to extend over the whole time from November, 1887, up to the 15th of December, 1898, part of them were positively disproved in this case, for the accounts were not kept against her, and it is not pretended that they were; and, though the cotton raised was used to pay the advances, it was not sold in her name, nor were the advances so made.

The district judge, in his reasons for judgment, referring to what the situation would be if defendants' claim in reconvention were disallowed, says:

"Then, notwithstanding that for thirteen years defendants' capital has fed and clothed the plaintiff's family, educated her children, paid the doctors' bills of an afflicted husband, who owned not a dollar's worth of property, and has transformed her plantation from a place with but thirty-five acres of cleared land with dilapidated cabins into a highly improved plantation with ten or twelve cabins, two hundred and eighty-five acres of cleared land fenced and drained, and capable of yielding an annual rental equal to or exceeding the original cost, defendants can recover nothing except such items as are shown to have inured to the benefit of the plaintiff's separate estate."

We feel the full force of these remarks, but the matters we are now dealing with are of the very strictest law, into which equitable considerations play little part. Our Reports are filled with similar cases. Chief Justice Manning refers to the subject (in Chaffe v. McIntosh, 36 La. Ann. 827) of "men falling into pitfalls that have all along been pointed out by successive decisions of the court."

It is true that plaintiff's property has been benefited by moneys received from the defendants; but the husband received these moneys from them, not for her, but in his own name, on his own account. If she has benefited, it has been by the application of this money by her husband to her property, and her legal liability for said benefit is to him, and not to defendants. When a husband who borrows money on his own credit account uses it in paying off a mortgage debt affecting his wife's property, the money derived from the lender unquestionably benefits the wife; yet the lender has no direct claim against her by reason of that fact. There is no privity between the lender and the wife, and he can only reach the wife by proceeding against the husband, and utilizing the judgment obtained against her. Atkins v. Robinson, 52 La. Ann. 925, 27 South. 134, 529; Succession of Kernan, 105 La. 603, 30 South. 239; Randolph v. Stark, 51 La. Ann. 1131, 26 South. 59.

For the reasons herein assigned, it is hereby ordered, adjudged, and decreed that the judgment of the district court be annulled, avoided, and reversed in so far as it renders judgment in favor of the defendants against the plaintiff, and that their demand against the plaintiff be, and it is hereby, rejected. It is further ordered, adjudged, and decreed that the judgment in favor of the plaintiff against the defendants be, and the same is hereby, affirmed. Appellants to pay costs in both courts.

On Rehearing.

(June 24, 1904.)

PROVOSTY, J. The order of the court granting a rehearing in this case was very short, and was as follows:

"It is ordered that the rehearing applied for in this case be granted on the one point of the reconventional demand of Atkins Bros. for expenses on the property inuring to the benefit of Mrs. Voiers."

The intention of the court was to limit the inquiry to the liability of Mrs. Voiers for the expenses of Atkins Bros. on the property after they took possession of it. The incidental question of the nature of the possession, whether in good or in bad faith, was also left open, but with little probability of the court's changing its views upon it; and the court at once announces that it has not done so, and that the case must now be considered from the standpoint of the possession having been in bad faith.

In behalf of Mrs. Voiers it is contended that a possessor in bad faith can claim compensation only for such improvements as are susceptible of being removed, and for such expenses as have been incurred in the preservation of the property; and that, as a consequence, nothing can be recovered for the following items: Cost of lake ditch, $923.25; cost of other ditching, $240; clearing timber, $101; clearing 80 acres of land, $640; digging and cementing three cisterns, $45.

This contention appears to us to be well founded. No one has a right knowingly to go upon the property of another, and cut down the timber, and dig ditches, etc., even from a good motive. If he does it, so much the worse for him; he has no claim to make.

This was the decision of the Roman law even as to buildings and other improvements separable from the soil:

"Si quis in alieno solo sua materia ædificaverit * * * si scit alienum solum esse, sua voluntate amississe proprietatem materiæ intelligitur; itaque, neque dirutoquidem ædificio, vindicatio ejus materiæ competit." D. L. 41, T. 1, 7, § 12.

He loses the ownership of the materials, and cannot claim them even if the edifice should fall; or, in other words, even though the materials should become separated from the soil.

"Ex diverso, si quis in alieno solo sua materia domum ædificaverit, cujus et solum est. Sed hoc casu materiæ dominus proprietatem ejus amitit, quia voluntate ejus alienata intelligitur, utique si non ignorabat, in alieno solo se ædificare; et ideo, licet diruta sit domus, vindicare materiam non possit. Certe illud constat, si, in possessione constituto ædificatore, soli dominus petat, domum suam esse, nec solvat pretium materiæ et mercedes fabrorum, posse eum per exceptionem doli mali repelli; utique si bonæ fidei possessor fuit, quiædificasset: nam scienti alienum esse solum, potest culpa objici, quod temere ædificavit in eo solo, quod intelligeret alienum esse." Institutes, L. 11, T. 1, § 30.

That is to say, the possessor in good faith may recover for his materials and the price of workmanship, but not the possessor in bad faith, who may have his fault cast up to him, since he knew that the soil was another's.

In his Traité du Douaire, No. 277, Pothier has the following:

"Il ne peut aussi être douteux que, lorsque la douairière a fait elle-même de grosse réparations nécessaires, qui ne proviennent pas de sa faute, ni de défaut d'entretien, la propriétaire de l'héritage doit rembourser à la douairière ou à ses héritiers ce qu'elles ont coûté ou dû coûter.

"La question ne peut tomber que sur les impenses non nécessaires, faites par la douairière sans l'ordre du propriétaire, mais qui ont beaucoup augmenté l'héritage. Le propriétaire, qui rentre dans l'héritage, est-il obligé de rembourser les héritiers de la douairière, si non en total, du moins jusqu'à due concurrence de ce qu'il en a profité, et de ce que son héritage en est augmenté de valeur? Cette question se décide par le principe qui est établi au titre des Institutes De rer. divis., § 12. Justinien après avoir accordé à celui, qui a bâti de bonne foi sur un héritage qu'il croyait de bonne foi lui appartenir, la répétition des impenses utiles qu'il a faites, quand le propriétaire de l'héritage qui en a profité, la refuse à celui qui avait connaissance que l'héritage ne lui appartenait pas par ce principe: nam scienti, dit Justinien, alienum solum esse, potest objici culpa, quod ædificaverit temere in eo solo quod intelligebat alienum esse.

"Suivant ce principe, le droit de la douairière étant un simple droit d'usufruit, qui ne lui donne que le droit de jouir des héritages sujets à son douaire dans l'état ou ils sont, et qui ne lui donne point celui d'y construire des bâtiments, d'y faire des plantations et autres améliorations, de son autorité privée, sans l'ordre du propriétaire, la douairière a été en faute de faire ces

améliorations sans l'ordre du propriétaire; et elle ne peut en conséquence, ni elle ni ses héritiers, en avoir aucune répétition contre le propriétaire, qu'elle n'a pas dû constituer dans des dépenses qu'il ne voulait pas faire.

"On ne peut, en ce cas, opposer la règle, Neminem æquum est cum alterius damno locupletari; cette règle ne devant avoir lieu que lorsque celui qui a fait les impenses dont un autre profite,— et dont il lui demande le remboursement, les a faites de bonne foi; mais elle n'a pas lieu, lorsque celui qui les a faites, est en faute pour les avoir faites sans nécessité sur l'héritage d'autrui, qu'il savait être l'héritage d'autrui. Faute d'avoir consulté, pour les faire, le propriétaire qui n'eût peut-être pas voulu s'engager dans cette dépense, il n'en doit avoir aucune répétition, et il doit être censé avoir voulu, en les faisant, en gratifier le propriétaire—donasse videtur."

This we translate as follows:

"It cannot be doubtful that when the dowager has made heavy repairs, the necessity for which has not been brought about by any fault of hers, nor by any failure on her part to keep up the premises, the proprietor owes her or her heirs the cost of same.

"There can arise a question only in connection with unnecessary expenses incurred without order from the owner, but which have largely enhanced the value of the property. In such a case, must the owner, on getting the property, recoup the heirs of the dowager, if not in full, at any rate to the extent that he profits, and that the property is enhanced in value? This question is decided according to the principle established under the title of the Institutes de rer. divis. § 12. Justinian, after according to him who has built in good faith upon land which he thought belonged to him the right to recover these expenses from the owner of the land who profits by them, refuses the same right to him who knew that the land did not belong to him. This he does under this principle: 'Nam scienti,' says Justinian, 'alienum solum esse, potest objici culpa, quod ædificaverit temere in eo solo quod intelligebat alienum esse.'

"According to this principle, the right of the dowager being simply a right of usufruct, which only gives the right to enjoy the estates subject to her dower in the condition in which they are, and which does not give the right to construct buildings, make plantations, and other improvements on them of her own authority, without order from the owner, the dowager has been in fault in making these improvements without the order of the owner; and neither she nor her heirs can, in consequence, have any claim for them against the owner, whom she should not have subjected to expenses which he did not wish to make.

"There cannot be invoked in such a case the rule, 'Neminem æquum est cum alterius damno locupletari;' this rule obtaining only when the person who has incurred expenses by which another is benefited, and who is making a claim for reimbursement, has acted in good faith; but it does not obtain when the person who has incurred the expenses has done so without necessity on the land of another, which he knew to belong to another. Having failed to consult the owner, who perhaps would not have cared to enter upon such an expense, he should not have the right to claim reimbursement; it ought to be considered that in incurring these expenses he intended to make a present of them to the owner —donasse videtur."

Here this great expounder of the civil law lays it down that, while the dowager may recover for necessary expenses, she cannot recover for plantations and other improvements put upon the property without the consent of the owner; and that the principle not to enrich one's self at the expense of another does not militate against this, inasmuch as that principle comes into play only when the possessor has been in good faith.

It is notable that what is here said of the dowager, applies under our Code to the usufructuary. Article 569, Civ. Code.

The same great civilian in his Traité de la Propriété, No. 346, et seq., discusses this whole question of the right of possessors in good and in bad faith to claim reimbursement or compensation, and reaches the conclusion that the possessor in bad faith is not entitled to compensation for useful improvements, whereby the value of the property has been increased. Replying to the objection that this appears to be against equity, he says:

"A l'égard de la règle, Neminem æquum est cum alterius detrimento locupletari, la réponse est, qu'elle peut bien être opposée par le possesseur de bonne foi, mais qu'elle ne le peut être par le possesseur de mauvaise foi; le propriétaire pouvant lui répliquer que l'équité lui permettait encore moins de constituer le propriétaire contre son gré, dans une dépense qu'il ne voulait pas faire, en faisant sur son héritage qu'il possédait injustement, des impenses qu'il savait n'avoir pas droit d'y faire; que s'il souffre de ce que ses impenses ne lui sont pas remboursées, il ne peut s'en prendre qu'à lui-même, puisque c'est par sa faute qu'il les a faites: or, on n'est point reçu à se plaindre de ce qu'on souffre par sa faute: id quod quis sua culpa damnum sentit, non videtur sentire. Cette réponse est justement celle que Justinien, au texte des Institutes ci-dessus rapporté, met dans la bouche du propriétaire, pour le décharger du remboursement des impenses utiles envers le possesseur de mauvais foi: nam, dit Jus-

tinien, scienti solum alienum esse potest objici culpa, quod ædificaverit temere in eo solo.

"Si le propriétaire n'est pas obligé de rembourser au possesseur de mauvaise foi les impenses utiles, jusqu'à concurrence de la somme dont l'héritage revendiqué en est augmenté de valeur, au moins ce propriétaire ne peut pas ce dispenser d'en souffrir la compensation jusqu'à due concurrence, avec la somme qu'il lui est due par ce possesseur pour le rapport des fruits: car le propriétaire est censé avoir déjà touché, jusqu'à due concurrence le prix des fruits, par l'emploi qui en a été fait à l'amélioration de son héritage. Ce serait s'en faire payer deux fois, que de n'en pas tenir compte au possesseur; ce que la bonne foi ne permet pas.

"Dans notre pratique, on laisse à la prudence du juge à décider suivant les différentes circonstances, si le propriétaire doit rembourser le possesseur de mauvaise foi ses impenses utiles, jusqu'à concurrence de ce que l'héritage revendiqué en est devenue plus précieux. Il y a une mauvaise foi caractérisée et criminelle, telle que celle d'un usurpateur qui a profité de la longue absence d'un propriétaire, or de la minorité d'un propriétaire qui n'avait point de défenseur, pour se mettre, sans aucun title, en possession d'un héritage: un tel possesseur de mauvaise foi doit être traité avec toute la rigueur du droit; il ne mérite aucune indulgence; et on ne doit point en conséquence lui faire raison des améliorations qu'il a faites à l'héritage, pendant qu'il le possédait. Au contraire il y a des espèces de mauvaises foi qui ne sont pas si criminelles, et qui sont excusables. Par example, j'ai acheté l'héritage d'un mineur de sa mère et gardienne, qui était alors très riche, et qui s'est obligée de le faire ratifier; depuis, il est arrivé un dérangement dans la fortune de ma venderesse: elle est morte. Le mineur devenu majeur a renoncé à sa succession, et a donné une demande en revendication contre moi. Je suis possesseur de mauvaise foi. J'avais scientiam rei alienæ, puisqu'en achetant j'ai eu connaissance que l'héritage appartenait au mineur, et que ma venderesse n'avait pas le pouvoir de l'aliéner: mais cette mauvaise foi n'est point criminelle; j'avais un juste sujet de me flatter que le mineur ratifirait, ou deviendrait héritier de sa mère: c'est pourquoi, je dois être traité avec indulgence, et le juge doit me faire raison des améliorations que j'ai faites sur l'héritage, jusqu'à concurrence de ce qu'il est plus précieux."

We translate as follows:

"With regard to the rule, 'Neminem æquum est cum alterius detrimento locupletari,' the answer is that this rule may well be invoked by the possessor in good faith, but not by the possessor in bad faith; it being possible for the owner to reply to him that equity still less gave him leave to involve the owner against his will in an expense which he, the owner, was unable to incur, by making upon this owner's property, wrongfully possessed, expenditures which the wrongful possessor knew he had no right to make; and if this wrongful possessor now suffers loss as a result of his expenses not being reimbursed, he has but himself to blame, since they were incurred through his own fault; and one cannot complain of a loss resulting from one's own fault: 'Id quod quis sua culpa damnum sentit, non videtur sentire.' This reply is precisely the one which Justinian, in the passage of the Institutes hereinabove cited, puts in the mouth of the owner, to exempt him from the reimbursement of useful expenses incurred by the possessor in bad faith. 'Nam,' says Justinian, 'scienti solum alienum esse potest objici culpa, quod ædificaverit temere in eo solo.'

"Though the owner is not bound to reimburse the useful expenses incurred by the possessor in bad faith, to the extent of the increased value of the property, he cannot object to compensation taking place between these useful expenses and whatever sum may be due him by the possessor for fruits and revenues; for the owner must be deemed to have already received these fruits and revenues by the use which has been made of them in improving his property. If he did not allow the possessor a credit to that extent, he would be exacting payment a second time for these fruits and revenues; and this good faith forbids.

"In our practice it is left to the discretion of the judge to decide, according to the circumstances of the case, whether the owner should pay back to the possessor in bad faith useful expenses up to the amount of the enhanced value of the property. If there has been marked and criminal bad faith, such as that of a usurper who has taken advantage of the long absence of the owner, or of the minority of an owner with no one to defend him, and gone into possession without any title whatever, such a possessor must be treated with the utmost rigor of the law. He deserves no indulgence. Hence he should not be allowed anything for the improvement which he made to the land while he held it. On the other hand, there are kinds of bad faith which are not so criminal, which are excusable. For example, I have bought the property of a minor from his mother and guardian, who was very rich, and who bound herself to have the sale ratified. Since then the fortune of my vendor has become disordered. She has died. The minor, on reaching majority, has renounced her succession, and sued me in revendication. I am a possessor in bad faith, since I knew the property belonged to the minor, and that my vendor had not the power to sell it. But this bad faith is not criminal. I had good reason to flatter myself that the minor would ratify, or would become the heir of his mother. I ought to be treated with indulgence, and the judge ought to require that I be indemnified to the extent of the increased value of the property."

The common law is even more rigorous than the civil law, as will appear from the following extract from the Am. & Eng. Ency. of L., vol. 16, p. 66:

"By the English and American common law the true owner of land might recover it in ejectment without any liability to pay for improvements which might have been made upon it by an occupant without title. Improvements annexed to the freehold the law deemed a part of it, and they passed with the recovery; and every occupant made improvements at his peril, even if he acted under a bona fide belief of ownership.

"This rigid rule was founded upon the idea that the owner should not pay an intruder, or disseisor, or occupant for improvements which he never authorized. It was supposed to be founded in good policy, inasmuch as it induced diligence in the examination of titles, and prevented intrusions upon and appropriations of the property of others."

The articles of our Code on the subject are articles 2314 and 508, which read as follows:

### Article 2314.

"He to whom property is restored must refund to the person who possessed it even in bad faith, all he had necessarily expended for the preservation of the property."

### Article 508.

"When plantations, constructions, and works have been made by a third person, and with such person's own material, the owner of the soil has a right to keep them or to compel this person to take away or demolish the same.

"If the owner requires the demolition of such works, they shall be demolished at the expense of the person who erected them, without any compensation; such person may even be sentenced to pay damages, if the case require it, for the prejudice which the owner of the soil may have sustained.

"If the owner keeps the works, he owes to the owner of the materials nothing but the reimbursement of the value and of the price of the workmanship, without any regard to the greater or less value which the soil may have acquired thereby.

"Nevertheless, if the plantations, edifices or works have been made by a third person evicted, but not sentenced to make restitution of the fruits, because such person possessed bona fide, the owners shall not have a right to demand the demolition of the works, plantations or edifices, but he shall have his choice either to reimburse the value of the materials and the price of the workmanship, or to reimburse a sum equal to the enhanced value of the soil."

Article 2314 needs no comment. Counsel for Mrs. Voiers concede that possessors in bad faith are entitled to recover expenses incurred in the preservation of the property.

Article 508 is taken verbatim from the Code Napoleon, art. 555. As originally drafted and reported, this article did not contain the fourth paragraph; so that the possessor in good faith, like him in bad faith, had no other right than that of removing his materials, etc., in case the owner elected not to keep them. In other words, he was not entitled to recover for the enhanced value of the property. In the course of the discussions before the tribunate, it was amended by the addition of the fourth paragraph. The consideration which led to this amendment was the following:

"The law attaches so much favor to the possessor in good faith that it permits him to retain the fruits he has received; it would then be repugnant to principle to treat him with the same severity as the individual whose possession is tainted with bad faith. He ought not to lose his expenses. To that end, the tribunate proposes to compel the proprietor to pay him, either the price of his materials and the wages of the workmen, or the enhanced value of the soil."

See Discussions, Civil Code, art. 555. Also Fenet, same article.

Thus, it is seen, the article of the Code Napoleon was adopted with the distinct understanding that the possessor in bad faith would have no other right than to remove his materials in case the owner elected not to keep them; that he would not be entitled to the enhanced value of the soil. The article will be read in vain to find support for a claim on his part to the enhanced value of the soil.

In the case of Gibson v. Hutchins, 12 La. Ann. 546, 68 Am. Dec. 772, this court said:

"The right of a possessor to recover of the true owner for ameliorations inseparable in their nature from the soil cannot, it appears to us, be recognized in any case, unless the possessor was at least a possessor in good faith, believing himself to be the owner. The mere possessor is presumed to have made such changes for his own amelioration, and to have received a sufficient reward in the immediate benefit which he reaps from the enhanced production of the soil. Perhaps the true owner would have preferred that the primitive forest should remain. Perhaps the ditching will not suit the purposes for which he wishes to use the land. To place a real proprietor at the mercy of a possessor in bad faith, by requiring him to pay the latter, who has, without just authority, changed the face of the land for selfish purposes of his own, does not accord

with those rules of law which give the dominion of the soil to the proprietor only, or to one who has a right to consider himself a proprietor for the time. An intruder may recover such expenses as are necessary for the preserving of the thing. A negotiorum gestor may recover what he has spent in doing the business necessary to be done for another, even without a mandate. It is a general rule of equity that no one should enrich himself at another's expense. But this doctrine must not be stretched so far as to let an intermeddler recover for willfully doing what was not necessary to be done, or what the owner might not wish to have done, and what the law did not require to be done. If an intermeddler goes to expense with the single view of benefiting himself, and reaps the benefit, he cannot demand a reimbursement for his time and trouble from the person upon whose property he has intruded, by suggesting that he, too, has been incidentally benefited."

In Cannon v. White, 16 La. Ann. 91, the court said:

"The defendant, being thus a possessor in bad faith, owes indemnity, and is entitled, in law, to no other claim for his improvements than those stated in the three first sentences of the Civil Code, art. 508."

That is to say, he has a right to remove his materials, if the owner does not elect to keep them. In that case nothing was allowed to the defendant for clearing land, except that he was not made to pay rent on the land which he had cleared.

In Wood's Heirs v. Nicholls, 33 La. Ann. 751, the court said:

"As to improvements in their nature inseparable from the soil, such as ditching, wells, etc., he is not entitled to compensation."

In Breaux-Renoudet Lumber Co. v. Shadel, 52 La. Ann. 2098, 28 South. 292, the court said:

"They can be regarded in no other light than as intruders on the land. Being such, they can neither claim to be paid the expenses they incurred in deadening the trees, nor the trees which they felled, nor their value. Civ. Code, art. 502. The expenses which they incurred were not such as were necessary for the preservation of the thing, and it may well be that the true owner may have preferred that the primitive forest should remain."

McDade v. Levee Board, 109 La. 625, 33 South. 628, and other like cases, where the possessor in bad faith was permitted to offset the claim for fruits and revenues by a claim for enhanced value resulting from land clearing and other improvements inseparable from the soil, militate in no wise against the foregoing. The claim for fruits and revenues is nothing more than a claim in indemnity for loss, and naturally may be defeated by proof that, instead of a loss, there has been a gain. The theory of these cases is well and fully expounded in the case of Wilson v. Benjamin, 26 La. Ann. 588, as follows:

"The defendants set up another claim for $10,560 for the rent of the land, but as there was, previously to the sale in 1855, no privity of contract between them and the plaintiff, the case is not one of letting and hiring. Civ. Code, art. 2639. The claim is one in the nature of damages for the wanton detention of property; and, although the trespasser is not allowed to prefer a claim for the enhanced value of the soil attributable to his improvements, yet in the admeasurement of damages to which he is subject the benefit derived from such improvements becomes an important element. The improvements, such as clearing a portion of the land, the whole of which was at the time a forest, and putting it in a high state of cultivation, were worth, independently of the buildings and constructions, fully the amount at which the detention of the property might be appraised."

Cases may be found here and there in our Reports where the strong magnet of equity has swerved the court from the straight line of the rule; where, as in the time of Pothier, while the rule was recognized to be one way, the practice was sometimes permitted to go the other way in cases appealing strongly to the sense of justice of the court. It is needless to refer to these cases. What may have been justifiable in the time of Pothier, under the guidance of general principles, is not permissible under the Code Napoleon or our Civil Code, which have drawn the line sharply between the two kinds of possession, and prescribed the rights of the possessor in bad faith.

While the evidence is of the scantiest, we shall accept it, in the absence of contradiction, and allow defendants the following items: Four double cabins, $450; shed at landing, $60; fencing and repairing fences, $102.50. This last item is properly classable

as expenses for the preservation of the property, for which defendants are entitled to absolute judgment. For the other two above items defendants have a right only to a conditional judgment. The remaining two items, salary of W. H. Young, $200, and balance of improvements, $200, are too vague and uncertain. Neither the statement nor the evidence informs us what the improvements were, nor what proportion of the time of Mr. Young was taken up by his overseeing the construction of the buildings and fences, for which part of his time alone defendants would have the right to recover.

It is therefore ordered, adjudged, and decreed that the former decree of this court be reinstated, with the sole amendment that the defendants have judgment against the plaintiff for the sum of $102.50, with legal interest from judicial demand; and, in case the plaintiff elects to keep any of the buildings put upon the land in controversy by defendants, then that for any of the buildings so kept defendants have judgment against plaintiff for the estimated value thereof as follows: $112.50 for each cabin kept of the four cabins for which defendants have claimed $450, and $60 for the seed shed at the landing. Plaintiff to make her election in the premises before proceeding to the execution of the present judgment. The amounts thus allowed to the parties on their respective demands to compensate each other pro tanto.