(46 South. 437.)

No. 16,668.

WELLS et al. v. BLACKMAN (WEEMS et al., Interveners).

(Jan. 9, 1908. On Rehearing, April 27, 1908.)

1. EVIDENCE — PAROL EVIDENCE AFFECTING WRITINGS.

It is in order that each of the parties to the making of a contract may express with exactness his own idea, and clearly comprehend that of the other, and to afford conclusive proof of the common understanding, that the art of writing and the expedient of the authentic act are resorted to; hence the recollection of one of the parties to a contract witnessed by an authentic act, unsupported by conclusive proof of fraud or error, cannot prevail against the terms of the act, and, a fortiori, is this true when the other contracting party is no longer living.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, §§ 1756–1765.]

2. VENDOR AND PURCHASER — PAYMENT OF PURCHASE MONEY—EFFECT OF DEFAULT.

Where, by the terms of sale, by authentic act of immovable property, no part of the price is payable in cash, and the vendee, who is in possession at the time of the sale, so continues, the sale and delivery of possession are none the less complete because such vendee fails to make the deferred payments as called for by the contract; nor does the title revert to the vendor as a consequence of such failure.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Vendor and Purchaser, § 84.]

3. ESTOPPEL — ESTATES SUBSEQUENTLY ACQUIRED — COVENANT AGAINST INCUMBRANCES.

Where the vendor of immovable property warrants it free of mortgage, he cannot be heard to set up against his vendee, or those claiming under him, a title subsequently acquired in foreclosure of a mortgage warranted against. Any title so acquired by the vendor will inure to the benefit of the vendee and his heirs and assigns.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Estoppel, § 101.]

4. PERSONS ENTITLED TO CLAIM BY PRESCRIPTION—POSSESSOR IN BAD FAITH.

Where immovable property is sold with warranty, and it, being thereafter sold under a mortgage granted by the vendor and warranted against, is bought in by the mortgagee under an agreement whereby he sells it to the vendor (and mortgagor), the title so acquired inures to the benefit of the original vendee, and his vendor, going into possession under such title, becomes a possessor in bad faith, and is not protected by the prescription of 10 years, which

bars an action for the recovery of such property against a possessor in good faith.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 1, Adverse Possession, § 491.]

5. SAME.

Ignorance of law cannot be alleged as a means of acquiring property; hence "the error of law under which a possessor may be as to the validity of his title shall not give the right to prescribe under it."

6. JUDGMENT — CONCLUSIVENESS — MATTERS CONCLUDED.

Where one sues for the partition of a tract of land, and provokes a judgment recognizing him as the owner of a certain undivided interest, and recognizing the parties made defendant as the owners of the remaining interest, and the partition is effected on the basis established by the judgment, the plaintiff cannot thereafter be heard to set up another title against such defendants. which he held when the suit was begun, and to claim thereunder a further interest in the portion allotted to them.

7. ESTOPPEL—KNOWLEDGE OF RIGHTS.

One who acts in ignorance of his rights is not estopped to claim property which belongs to him by acting as an expert or appraiser in a partition proceeding in which such property is divided among others.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Estoppel, §§ 128, 129.]

8. PARTIES — INTERVENTION — PETITORY ACTIONS.

A mortgagee, whose debt has not matured and whose mortgage is not called in question, is without interest to intervene in a controversy between his mortgagor and a third person respecting the title to a part of the property mortgaged, and especially where it appears that the part not involved in the controversy is amply sufficient to satisfy his mortgage.

9. COURTS — RULES OF DECISION — NECESSITY FOR ADJUDICATION.

Heirs of the wife, asserting title by inheritance to property of which the community held possession without title, occupy the same position quoad the owner as does the surviving husband and father; and in a suit for the recovery of such property, where the validity of a sale of part of it and the mortgage of the whole by the community or the surviving husband and heirs of the wife is not put at issue, a discussion of the effect of a possible future decision thereon is premature.

10. IMPROVEMENTS—COMPENSATION.

A possessor in bad faith is entitled to recover the amount expended for the preservation of the property, and may recover, by way of set-off against a demand for rents and revenues, the amount expended for improvements, of which the owner may order the removal, provided the owner, who has the option, elects to retain them. He cannot recover for improvements inseparable from the soil, such as ditching and clearing.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Improvements, §§ 4, 7.]

On Rehearing.

11. JUDGMENT — CONFORMITY TO PLEADINGS AND PROOFS—DESCRIPTION.

The claim set out in the petition was in effect for an undivided half of the land, and the description in the deed also.

The decree is limited to the undivided half.

12. TRIAL—RECEPTION OF EVIDENCE—EFFECT OF FAILURE TO OBJECT—ADMISSIBILITY UNDER PLEADING.

Testimony enlarges the pleadings when it is evident that knowingly and with deliberation witnesses have testified regarding facts not alleged and the proof has been admitted without objection.

As the deed calls for a half of the tract, and the petition also, the title is not for the whole, although the latter has been referred to in course of the verbal testimony from that point of view.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trial, § 266.]

13. EVIDENCE—TITLE TO REALTY.

Title to realty generally is not made to depend upon the words of witnesses hastily uttered and evidently in error, when it is recalled that the evidence reduced to writing calls for an undivided half.

Originally there had been a sale. The vendee had gone into possession. In one of the deeds it was stated that part of the price had been paid.

14. VENDOR AND PURCHASER — PAYMENT OF PURCHASE MONEY—EFFECT OF DEFAULT—RESOLUTORY CONDITION.

In the present situation, and after the years that have elapsed, and for other reasons stated, resolutory condition cannot be enforced.

15. COVENANTS — AFTER-ACQUIRED TITLE — WARRANTY CLAUSE.

It stands as an absolute bar to the recovery of the land sold.

Monroe, J., dissenting in part.

(Syllabus by the Court.)

Appeal from Thirteenth Judicial District Court, Parish of Rapides; James Alexander Williams, Judge ad hoc.

Action by E. M. Wells and others against W. F. Blackman, in which Eugene V. Weems and others intervened. Judgment for defendant, and plaintiffs appeal. Affirmed in part, and reversed in part and rendered.

Robert Persifer Hunter and Francis Rivers Richardson, for appellants. W. F. Blackman (W. C. & J. B. Roberts, Blackman & Overton, Andrews & Hakenjos, and White, Thornton & Holloman, of counsel), for appellee Blackman. Blackman & Overton, for appellee Weems.

### Statement of the Case.

MONROE, J. This is a petitory action, brought by Ennemon M. Wells, Jeff Wells, and Mesdames Cockerille, Jones, Calvit, and Taylor, as the heirs of their mother, Mrs. Jeannette Dent, deceased, widow of Montford Wells, to recover six undivided eighths interests in a portion of Upper Wellswood plantation, in the parish of Rapides, together with rents and revenues in the same proportion. Defendant denies some of the allegations upon which plaintiffs rely, admits others, sets up title derived through mesne conveyance from Mrs. Jeannette Wells, and pleads estoppel and prescription; and his four children (who are majors), issue of his marriage with Mrs. Ellen (Wells) Blackman, interpose the same pleas on their own account, as does also Eugene V. Weems, who alleges that he holds a mortgage granted by defendant on the property in question. It is admitted that plaintiffs are heirs of Mrs. Jeannette Wells, that another heir is Chas. M. Wells (not a party to the suit), and that the remaining child and heir was the (now deceased) wife of the defendant. As plaintiffs and defendant alike assert title under Mrs. Jeannette Wells, the history of her title need be mentioned only by way of explanation. Without going further back, it appears that Hatch Dent and Levi Wells owned adjoining tracts of land; that Martha L. and Jeannette Dent, daughters of Hatch Dent, married, respectively, Thomas Jefferson and Montford Wells, sons of Levi Wells; that upon the death of their father Martha and Jeannette (Dent) Wells inherited, in indivision, the land owned by him; that their husbands, upon the death of Levi Wells, acquired by purchase at succession sale, in indivision, the land owned by him; that they respectively transferred the interests so acquired to their wives by dations en paiement, whereupon (or possibly at an earlier period) both tracts were united in what has since been called "Wellswood Plantation." Mrs. Martha L. Wells died in 1867 or 1868, and her sister, as her sole heir, accepted her succession; but the succession owed debts for which the interest of the decedent in the Hatch Dent tract of Wellswood Plantation was sold, and, if we understand the matter, her (supposed) interest in the Wells tract was sold as the property of her husband or of his succession, all as will appear hereafter.

In December, 1875, there was sold, under an execution issued upon a confession of judgment in favor of defendant, and adjudicated to him, for $3,500:

"The same land inherited by Mrs. Jeannette Wells from her father's (Hatch Dent's) estate; also the undivided half of 500 acres, more or less, conveyed to Mrs. Jeannette Wells by her husband, Montford Wells, adjoining the above-described tract."

On June 19, 1877, defendant entered into a written agreement with E. North Cullom, which recites that Cullom had become the owner of a certain judgment against the estate of Mrs. Martha L. Wells; that the estate was indebted to him for taxes disbursed, and that Mrs. Wells had been indebted to him for professional services as attorney at law; that W. F. Blackman desired to become the owner of said claims and to be subrogated to the liens and privileges by which they were secured; and that Cullom, in consideration of the payment of $1,000, the receipt of which is acknowledged, and of the further payment of $1,500 on July 1, 1878, and of the taxes due and to become due on the property ("the undivided landed interests, located in said parish," of Mrs. Martha L. Wells),

agreed to transfer said claims to him (Blackman) "for the sole benefit of his wife and children," etc. In March, 1879, defendant executed and delivered an instrument reading· as follows, to wit:

"State of Louisiana, Parish of Rapides.
"Be it known and remembered that, in the settlement of all business transactions between Mrs. Jeannette D. and Montford Wells and W. F. Blackman, growing out of the purchase and payment of debts of Wellswood plantation, I, W. F. Blackman, agreed, and do by these presents agree and bind myself, my heirs.and assigns, to deed unto Mrs. J. D. or Montford Wells, or both together, all the Wellswood plantation purchased by me at public sales, with the exception of 700 acres of open land, which said 700 acres of land is fronting on Bayou Boeuf and divided from the lands of the plantation, on the left descending bank, by what is known as the 'stock lane,' and on the south by land of Mrs. P. M. Richardson, in the rear by land of the Compton heirs—the land above described is known as the 'Sugar Field'—with all the buildings, machinery, and improvements thereon, or thereto belonging; the said deed to be given at any time when required. It being understood that the said Mrs. J. D., or Montford, is to pay the sum of $1,500, with interest, to E. N. Cullom, and $300 to W. A. Levy, for which the said Blackman is bound. Thus done and signed this the 26th day of March, A. D. 1879.
"[Signed]         W. F. Blackman."

And on March 23, 1882, he executed a notarial act containing the following, among other recitals, to wit:

"Personally came * * * Wilbur F. Blackman, * * * who declared * * * that he * * * did purchase, at sheriff's sale under an execution * * · * issued in the suit of W. F. Blackman v. Jeannette Wells. * * * all the rights and interest that the said Mrs. Jeannette Wells had in and to an undivided portion of the Wellswood plantation. * * * And, whereas, the said * * * Blackman declared further that he subsequently bought at succession sale of Mrs. M. L. Wells her undivided onehalf interest in and to the Hatch Dent portion of Wellswood, * * * and he, the said Blackman, did agree, and made an agreement in writing, to transfer to the said Mrs. Jeannette Wells * * * a certain portion of the land purchased as aforesaid on the payment of a certain debt which the said Blackman had contracted to E. North Cullom: * * * Now, therefore, I, the said W. F. Blackman, * * * do by these presents grant, bargain, sell, and convey to the said Mrs. Jeannette Wells * * * the following described property, to wit: All the upper portion of said Wellswood plantation, starting at a point on the left (descending) bank of Bayou

Boeuf, opposite to what is known as the 'Stock Lane,' on the east side of the public road, the line to be run down the center of the said stock lane until it reaches the Dent (or Callahan) Bayou, which crosses said lane about 500 yards from the public road; thence along and down the center of said bayou until it reaches a point opposite the lowest cleared land on said Wellswood plantation which was cleared previous to the year A. D. 1864, and what was known as the 'Sugar House Field,' and from said starting point up the right (ascending) bank of Bayou Boeuf to the line between the Compton home place and said Wellswood plantation. The land here conveyed is known as the 'Hatch Dent portion of the Wellswood plantation, above the stock lane.' And an undivided one-half interest in and to 575 acres of land, known as the 'Wells portion of the Wellswood plantation'—all containing about 550 or 600 acres of open land, more or less, bounded in front by Bayou Boeuf, in the rear by woodlands, below by land of W. F. Blackman, above by the Compton home place. To have and to hold the within-described lands unto the said Mrs. Jeannette Wells, her heirs and assigns, forever. The consideration of this sale is the assumption of the debts of the said Blackman to E. North Cullom, due by said Blackman, and to be paid by said Mrs. Jeannette Wells as follows: The sum of $1,000 in cash to be paid within 30 days from date, and $1,000, with 8 per cent. interest per annum from date, due 12 months from date, and $500 due 18 months from date, with 8 per cent. interest per annum from date. And in further consideration the said Mrs. Wells does hereby ratify and confirm and sell and convey, said sale being made for the purpose of ratification, all that portion of the Wellswood plantation south of the line designated, to wit: * * * The lands herein described being what is known as the 'Sugar House Field,' said to contain 700 or 750 acres, more or less. Further, the said says Mrs. Jeannette Wells does hereby convey, sell, and deliver unto said W. F. Blackman 200 acres of woodland known as the 'back concession,' lying in the rear of and immediately adjoining said cleared lands above described, to have and to hold same forever. And it is further agreed that the said stock lane remain open for the common use of those who now, or who may hereafter, own Wellswood plantation. To have and to hold the lands herein conveyed, with all the improvements thereon, for themselves their heirs and assigns forever, warranting the title from one to the other against all mortgages or any other incumbrances whatever, except the taxes due on Wellswood plantation for the years 1877 and 1878 and one-half of the taxes due on said Wellswood plantation for the years 1880 and 1881."

In the meanwhile, on June 30, 1877, defendant had mortgaged the property which had been adjudicated to him in December, 1875,

to Allen, Nugent & Co. to secure $5,964.40 of money and supplies advanced to him for the crop of 1877, describing the property as in the sheriff's deed. In April, 1878, there was adjudicated to defendant, at a sale made by order of court to pay the debts of the succession of Mrs. Martha L. Wells, for $150:

"All the right, title, and interest of the succession * * * in and to * * * the undivided one-half of the Hatch Dent tract of the Wellswood plantation," etc.

And in August, 1878, in order to secure advances for the crop of that year, defendant mortgaged the entire property to Allen, Nugent & Co.

On April 20, 1882, Mrs. Jeannette Wells executed a notarial act of sale to her son Charles M. Wells of 200 acres of land, which had been included as conveyed to her in the deed executed by defendant on March 23, 1882; the recited consideration being $1,000 cash, the receipt whereof is acknowledged, the assumption by the vendee of one-third of the taxes then due and of one-third of the debt which the vendor had promised to pay E. North Cullom "as part of the purchase price from her vendor, W. F. Blackman," and the further assumption by the vendee of the obligation to pay the vendor $250 a year for the balance of her life. Mrs. Jeannette Wells died in December, 1882, and C. M. Wells qualified as her executor and gave bond, with defendant as one of his sureties, and there was inventoried, as belonging to her estate, "the undivided half interest in * * * the Wells tract of Wellswood plantation." In October, 1883, the plaintiffs, Mrs. Calvit and Mrs. Jones, brought suit in the district court, alleging that they owned, in indivision with W. F. Blackman, defendant herein, and with their brother Chas. M. Wells, "a certain tract of land * * * comprising one undivided half of 550 acres, more or less, being a portion of the plantation known as Wellswood; also an undivided one-

half of the back concession of land (swamp), comprising 800 acres, more or less, being a portion of the lands * * * sold by the sheriff * * * on the 4th day of August, A. D. 1873, and purchased by Messrs. T. C. Manning, M. Ryan, and J. G. White; * * * also * * * an undivided half * * * of 100 acres of pine woodland, known as 'Dently'"—and praying for a partition of the same. In accordance with the prayer of the petition an inventory was made of the property described and a surveyor was appointed to delimit it, after which the matter was allowed to rest for a time.

In the early part of 1883 a correspondence was opened between defendant and T. H. Allen (who had become the transferee of the debt contracted by defendant in favor of Allen, Nugent & Co.), and on June 29th Allen's attorney wrote that a proposition submitted by defendant had been taken under advisement. On July 20th he submitted a counter proposition. On September 22d Allen wrote to his attorney, acknowledging the receipt of a letter inclosing one from defendant, and saying:

"I can assure Judge Blackman that I do not want his land, and, if it is ever sold, would prefer that he should be the real purchaser, if bid off by some other person. I want the money for the debt, and am willing to favor the judge as much as I can afford to do in the payment."

And on December 19th he wrote directly to defendant:

"I am just in receipt of your favor of the 18th; also one from Mr. Nugent on the same subject. After judgment is obtained and execution issued, I am willing to buy the property referred to at a price to cover the amount of judgment, costs, and attorney's fees, and sell the same to you for the price it is bid off at, payable in four annual payments, with 10 per cent. interest added," etc.

There are no copies of the letters written by defendant in the record, and the contents of those letters is therefore a matter of inference. On February 5, 1884, Allen obtained

judgment against defendant for $4,239.87, with interest and recognition of mortgage "on * * * the whole property known as 'Wellswood Plantation,' " etc.; and on May 26, 1884, the property was sold under the judgment so obtained and bought in by Allen. On July 2d it was sold by Allen to defendant, or rather Allen sold "all such rights, title, and interest" as he had acquired, as stated in his letter of December 19, 1883.

On July 7th, however, defendant executed a notarial act, reading in part as follows, to wit:

"Whereas, the said * * * Allen, * * * plaintiff in a certain suit entitled 'Thomas H. Allen v. W. F. Blackman,' No. 1 of the docket of the United States Circuit Court, * * * did agree with said Blackman that he would buy in certain lands * * * to be sold in said suit, and, after acquiring the same, that he would sell them to said Blackman for a price equal to said Allen's claim, * * * on the express condition, however, that, should said Allen have to bid for said lands a sum in excess of his claim, * * * then the said Blackman to hold him harmless; * * * and whereas, the said Allen * * * was obliged to bid * * * the sum of $6,500, being $563.-78 in excess of his claim; * * * and whereas, in pursuance of said agreement, the said Allen has made to said Blackman a title to said property; and, whereas, certain parties, claiming to be the heirs of Mrs. Jeannette Wells and Mrs. Martha L. Wells, did apply to said court for an injunction to prevent the sale of said lands, on the ground that said lands belonged to them, and prayed in their application that said lands be decreed to be their property, and in the event of their sale in said suit that all the proceeds, over and above the amount of said claim of the said Allen, be decreed to belong to them, which injunction was, however, refused: Now, therefore, * * * in order to protect and secure said * * * Allen, * * * the said Blackman * * * does by these presents especially mortgage * * * the following described property [describing the land conveyed, or ratified, to defendant by the act between him and Mrs. Jeannette Wells of March 23, 1883], said property so to remain mortgaged * * * until the termination, in favor of said Blackman or the said Allen, of any suit or proceeding in court of any or all of the heirs or legal representatives of the late Mrs. Jeannette Wells which may be instituted within 14 months from the purchase of the lands by said Allen; * * * the said Blackman hereby binding himself * * * not to sell, alienate, or incumber the property to the prejudice of these presents."

In November, 1885, on defendant's motion, experts were appointed in the partition suit which had been instituted in 1883 by Mesdames Calvit and Jones, and they reported that the property sought to be partitioned was divisible in kind, and thereupon the surveyor brought in a report and a notary was appointed to make the partition. At that juncture, however, Mrs. Jones filed an amended petition, alleging that the original petition failed to state the respective interests of the parties and that certain changes had taken place since it was filed, and further alleging, in substance, that the lands were formerly held in indivision by Thomas Jefferson and Montford Wells; that the interest of T. J. Wells had been sold at judicial sale and acquired, two-eighths by T. C. Manning, two-eighths by J. G. White, and one-eighth by M. Ryan; that petitioner had acquired the interest of White, and Mrs. Calvit the interest of Manning, but that Manning had caused said interest to be sold for nonpayment of the price, and that it had been acquired (indirectly) by petitioner; that Mrs. Calvit had, therefore, no longer any interest in the suit; that C. M. Wells had acquired the interest that had been owned by Ryan; and that Blackman owned three-eighths of the T. J. Wells half (acquired at a sale made under execution issued against J. Madison Wells), and the whole of the other undivided one-half, acquired at sheriff's sale from Mrs. Jeannette Wells; and that as matters then stood the property was owned in the proportions of four-sixteenths of the whole to petitioner, one-sixteenth to Chas. M. Wells, and eleven-sixteenths to Blackman. The partition was accordingly effected on that basis, the property partitioned as surveyed and delimited, being described as—

"a tract of land, with the buildings and improvements thereon, known as the 'Montford Wells home tract,' consisting of 514.17 acres; * * * also 800 acres of woodland, known as the 'back concession,' and 100 acres of pine land, known as 'Dently.' "

The representative of C. M. Wells declined to sign the act of partition; but it was signed by the plaintiff, Mrs. Jones, and the defendant, W. F. Blackman, and the plaintiff, E. M. Wells, signed in the capacity of expert, after which it was duly homologated by judgment of court. On November 17, 1888, defendant executed a notarial act containing the following, among other, recitals, to wit:

"* * * Wilbur F. Blackman * * * does grant, bargain, sell, and convey * * * unto Chas. M. Wells, * * * represented by C. Simon Cullen, * * * the following described property: * * * It being the same tract of land sold by Mrs. Jeannette Wells to the said Chas. M. Wells on the 20th day of April, 1882. * * * The consideration of this sale is the price and sum of $1,000 that was paid by the said Charles M. Wells in cash in order to effect a compromise and settlement with Judge E. North Cullom and to have canceled certain claims and judgments resting at that time on Wellswood plantation; the agreement at the time being that he was still to be the owner of the said 200 acres of land transferred to him by his mother as aforesaid, free of any incumbrances. This tract of land was sold under a judgment against me, the said Wilbur F. Blackman; and, fearing that this tract, * * * which properly belongs to the said Charles M. Wells, may be further incumbered by my debts, which would be unjust to him, I make the transfer, it being his property."

The evidence shows that C. M. Wells paid the $1,000 to Cullom in 1885, and he and the defendant testify that the payment was made in consequence of an agreement between them, and not in discharge of the obligation that C. M. Wells had assumed to his mother to pay one-third of the Cullom debt. In fact, being examined by defendant in regard to the conveyance from his mother and other matters, he testifies in part as follows, to wit:

"Q. Now, I want to know, Mr. Wells, was any part of the consideration ever paid to your mother? A. No, sir. Q. Did you ever pay her the $1,000 cash recited in there? A. No, sir. Q. Did you ever pay any part of the Cullom debt, as recited in this deed? A. No, sir. * * * Q. Did Mrs. Wells ever pay a dime of the Cullom debt, during her lifetime? A. No, sir. * * * Q. Now, Mr. Wells, I transferred to you some land, 200 acres of land, as described in this deed, in 1888. * * * This recites in here that you had paid $1,000 for me on the Cullom debt. I will read it to you:

'The consideration of this sale is the price and sum of $1,000, paid by the said Chas. M. Wells in cash in order to effect a compromise and settlement with Judge E. North Cullom and to have canceled certain claims and judgments resting at that time on Wellswood plantation.' Now, Mr. Wells, what time did you pay that $1,000? A. I think it was in 1885. Q. Was it after your mother's death? A. Oh, yes; about three years. Q. Did you pay any part of that $1,000 as a consideration, or connected with it, of the debt? Was any part of that $1,000 you paid to E. North Cullom paid in the deed of your mother to yourself, and did you pay it for yourself, and not for the benefit of your mother, her success on, and of your co-heirs? (Objected to and objection overruled.) Q. Did you pay that $1,000 for my benefit on that Cullom debt, in order that I would transfer you 200 acres of that land? A. I did. Q. Had it any connection whatsoever with the payment of the debt that your mother had assumed to pay E. North Cullom? A. No, sir. Q. You knew, Mr. Wells, that your property, the 200 acres of land, had been sold, and that we had all been sold out by Allen? A. I did. Q. And you knew this 200 acres of land had been transferred back to me by Allen? A. Yes, sir. Q. What is the comparative value of the property in dispute now to what it was 15 or 20 years ago? A. You mean at her death? Q. And afterwards, commencing 10 years ago and going back? A. You could have bought just such property as that at $10 or $12 an acre. * * * Q. What is such property worth now? A. I know property you could have bought for that price in the country you could not buy for $60 an acre now."

Redirect examination by plaintiffs' counsel:

"Q. You did pay E. North Cullom, or on the Cullom debt, $1,000 in the year 1885? A. Yes, sir. Q. How did you pay that? A. By check. Q. To whose order? A. E. North Cullom's. Q. Did you get written papers from Judge Cullom—any receipt or relinquishment—when you paid it? A. No, sir. Q. Well, as to the possession of these 200 acres, did you not go into possession under your mother's deed in 1882? A. I was cultivating the whole place as far as that is concerned. I had possession of the whole place, but I did not get the revenues from the place in 1882. I did not get the revenues until after I bought from Blackman. * * * Q. The deed from Judge Blackman to you was in 1888. From 1884 to 1888, did you not have possession and get the revenues? A. I don't remember, Mr. Hunter. I know, so long as my mother lived and the family was there, it took the revenues to support them."

It may be here remarked that the witness' mother died in 1882.

"Q. After your mother died, did you not go into possession and have the revenues of this place, under your deed from her? A. No; I

don't think I did. I don't think I did. Q. You don't remember distinctly about that? A. Not distinctly. Q. Now, after the Allen deed that Judge Blackman got, the Allen deed in 1884, did you not continue in possession and have the revenue of these 200 acres right along? A. I rather think I did, but I am not sure. * * * Q. You were at that time the executor of your mother's succession, and that property had been inventoried in her succession, had it not? A. Yes, sir. Q. You remember whether or not Judge Blackman had gone on your bond as executor? A. I do not. Q. You remember whether the property had been inventoried in your mother's succession? A. I do not."

The witness had, on a previous occasion, been called on behalf of defendant, and, being examined by defendant, had testified as follows:

"Q. How was that debt paid to E. North Cullom? A. Paid by you and I. Q. How much did you pay? A. $1,000. Q. When did you pay it? A. I forget the year. Q. After your mother's death, was it? A. I think so. I am pretty sure."

Cross-examination:

"* * * Q. You have referred to a deed made by Judge Blackman to you, in 1888, of some 200 acres that was transferred to you by your mother. I hand you a certified copy of that deed and ask you if you remember the transaction, and particularly state as to the consideration regarding the Cullom debt therein mentioned. A. No use of my looking at that, because I don't remember about those things. I told Mr. Hunter just now. I simply know I paid $1,000 towards that business. * * *"

Defendant himself, when he first testified in the case, said that Wells paid Cullom $1,000, and that he (witness) paid him $500 (by paying for a piano that Cullom bought from one Schmalinski), and his examination proceeded:

"Q. Was that $1,500 all that ever was paid to Judge Cullom? A. No, sir; he was paid $2,500. Q. When was the other $1,000 paid? I paid the other $1,000 cash when I made the agreement."

After the case had been remanded (on the previous appeal to this court) defendant again took the stand and testified as follows:

"Mr. Chas. M. Wells agreed that he would join me in paying Mr. Allen, if I would transfer him that 200 acres of land. * * * I sent for E. North Cullom. He came to this town,

and we went over to Jim O'Shea's office, and with Jim O'Shea and myself and Mr. Wells, and Mr. Wells and I executed our promissory notes in favor of Cullom for $2,500, and $1,000 to be paid within a certain length of time, $1,000 to be paid in 1886, I think—I am not sure —and $500 note to be paid to E. North Cullom. and [he] then and there transferred to me all the claims that he had against Mrs. Martha L. Wells' succession. Q. Did you get that transfer? A. No, sir; that transfer was burned up in Mr. John Ariall's office, with a large number of papers that would be material in this case. Q. What year was that? A. That agreement was made about the earlier part of 1885. * * * Mr. Chas. M. Wells paid the first note that we executed in favor of Cullom. I paid the second note in 1886, and the subsequent $500 note was paid by me to E. Schmalinski for a piano, as testified to by Schmalinski. I hold in my hand document marked 'Defendant 12,' a receipt from E. North Cullom. * * *"

The document referred to reads in part as follows:

"Avoyelles, La., Dec. 14th, 1885.

"Received of W. F. Blackman his two warrants on the State Auditor, each for the sum of $250, payable, respectively, the last of May and the last of June, A. D. 1886, out of his salary as judge. * * * When paid the same to be credited on two promissory notes which I hold against him and Chas. M. Wells," etc.

We find in the record no satisfactory explanation of the increase of the debt to Cullom from $1,500 (to which amount it was reduced by the original payment of $1,000 made by defendant) to $2,500, and we conclude that the witness is in error as to the transaction between Cullom, Wells, and himself, and that the only notes given on that occasion were the note of Wells for $1,000 and note of the witness for $500. Plaintiffs all testify to repeated efforts made by them to secure the services of attorneys to prosecute their claim. Jeff Wells says:

"Judge Blackman and I frequently talked, and I have heard him complain that the heirs said he had no title to the property, and he was very much annoyed about it."

Mrs. Taylor, being asked how she knew that Judge Blackman knew that the heirs were trying to get some one to take their case, says:

"Because, repeatedly, he has told me that there was no use in litigating; that he intended doing what was right by us, and dividing the plantation between us."

Miss Pattie Cockerille (daughter of one of the plaintiffs) testifies as follows:

"Did you ever have any conversation with him [Mr. W. F. Blackman], or hear any conversation between him and your mother? A. I both had conversations with him and heard conversations between him and my mother. Q. Can you remember, at this time, so as to be able to state, the substance of those conversations? A. It was relative to Wellswood plantation. Q. Can you remember the substance of what he said? A. Yes, sir. Q. When were the first of those conversations, with you personally, or with your mother? A. It was with me, sir. * * * It was in 1896. * * * He took me driving, and we had a conversation on the drive. He broached the subject. He said he understood the heirs were going to get a lawyer to sue for Wellswood, and he said there was no use doing it, and he asked if mother would join in it, and I said, 'Yes,' and he said we were not able to hire a lawyer, and, so far as he was concerned, it would cost him nothing, but it would be an expensive undertaking for the heirs. It could be settled otherwise. He knew it was theirs, and intended giving their portion to them. Q. You know whether what he said referred to the plantation or the back concessions? A. I do not know anything about the back concessions; had never heard of them. Q. It did refer to Wellswood plantation? A. It did refer to Wellswood plantation. He said he had 700 acres he bought from my grandfather, and, outside of that, he proposed to see that the heirs had their portion."

Testifying to a conversation between the defendant and her mother, the witness says:

"My mother was standing on the front gallery, and Judge Blackman was passing by, and came in. He had a carbuncle, or boil, on his neck, and he showed mamma the place on his neck, and he said, 'I understand you are going to sue me for Wellswood plantation,' and Mrs. Cockerille said, 'Don't you think it is time for us to have what belongs to us?' Q. Did he say anything further? A. He said he intended that they should have it. They must give him time, and wait; and she said that in her state of poverty she could starve while she was waiting."

The testimony of Mrs. Calvit and Mrs. Jones is not so specific, but tends in the same direction. Defendant's explanation of any conversations that he may have had is that he was talking about what are called "back concessions"; that is to say, lands in the rear of those granted by the government, and for which he has interested himself to some extent to obtain patents. He testifies that he was always willing, and frequently offered, or sent word to the heirs that he was willing, to convey to them the property included in the deed to their mother, on payment of the Cullom debt. Being asked, "Did you consider that you could make a deed, warranting against a mortgage debt, and then acquire an adverse title to your own deed under that mortgage?" he replied, "I did." It is conceded that the land sued for is the tract of 323.76 acres described in the mortgage executed by defendant in favor of E. V. Weems February 9, 1904, and it is shown that the average rental value during the period for which plaintiffs claim has been $3.50 an acre. It is also shown that defendant has paid taxes and made certain repairs and improvements, which will be hereafter considered, as will be the claims of the interveners.

## Opinion.

Plaintiffs were called upon, in limine, to elect whether they would rely upon the conveyance from defendant to their mother (of March 23, 1882) and upon the inuring to them of defendant's subsequent acquisition of the land thereby conveyed, or would rely upon the instrument, called "counter letter," executed by defendant, and they answered that they would rely upon the conveyance, together with defendant's subsequent acquisition of title to the property conveyed, and not upon the counter letter, "as their muniment of title." The counter letter is, nevertheless, good evidence, as tending to show the circumstances leading to and connected with the transactions out of which this litigation has arisen and the considerations by which the parties were influenced; and, as parol evidence was admissible, and was admitted, to explain the agreement referred to in the conveyance of March 23, 1882, so the counter let-

ter was admissible for the same purpose. It is now said that the execution of the obligation to convey the property in question to Mrs. Wells, and of the conveyance itself, were voluntary acts of the defendant, not required by any previous agreement; that the instrument, so called, is not a counter letter; that defendant was already the owner of the title that Mrs. Wells ratified, and of the land that she conveyed, by the act of March 23, 1882, and needed and took nothing from her in those respects. It may be here stated that, in addition to the explicit declaration, contained in the instrument referred to as the counter letter, and reading, "Be it known and remembered that, in the settlement of all business transactions between Mrs. Jeanette D. and Montford Wells and W. F. Blackman, growing out of the purchase and payment of the debts of Wellswood plantation, I, Wilbur F. Blackman, agreed, and do by these presents agree, to deed," etc., and the equally explicit recital and declaration, contained in the notarial act of March 23, 1882, reading, "Wilbur F. Blackman did agree, and made an agreement in writing, to transfer to said Mrs. Jeannette Wells," etc., we find in the record a letter, dated December 20, 1880, written by defendant to Gen. (Montford) Wells, in which, after complaining that Mrs. Jones and Mrs. Calvit had "again" disturbed the quiet of his home, he states what he said to them in regard to the possible purchase by Mrs. Richardson of a certain interest in the T. J. Wells undivided interest in Wellswood (which had been acquired at sheriff's sale by different persons), and adds that he said:

"Further, that my agreement was that I would transfer the upper portion of Wellswood to any one that you and Mrs. Wells said, on payment of the Cullom claim."

The stipulation, contained in the act of March 23, 1882, as to the consideration for the conveyance from defendant to Mrs. Wells of the land here in controversy, reads as follows, to wit:

"The consideration of this sale is the assumption of the debts of the said E. North Cullom (meaning the debt due by defendant to E. North Cullom). * * * And in further consideration the said Mrs. Jeannette Wells does hereby ratify and confirm, and sell and convey, said sale being made for the purpose of ratification, all that portion of the Wellswood plantation south of the line designated [the stock lane] to wit: * * * The land herein described being what is known as the 'Sugar House Field,' said to contain 750 acres, more or less. Further, the said Mrs. Jeannette Wells does hereby convey, sell, and deliver unto W. F. Blackman 200 acres of woodland, known as the 'back concession,'" etc.

We do not, therefore, understand the point of view from which it is argued, and from which defendant testifies, that there was no agreement between him and Mrs. Wells with reference to his prospective purchases of Wellswood land, and that the ratification and conveyance by Mrs. Wells, as contained in the act of March 23, 1882, formed no part of the consideration for defendant's conveyance to her of the land here in controversy. Defendant is confronted upon both points with written instruments, signed by him, culminating in an authentic act, and we are bound to assume, in the absence of conclusive proof of error or fraud (neither of which is even charged), especially as the lips of one of the parties has been, for a quarter of a century, closed in death, that such act correctly expresses the understanding arrived at when both were alive, since it is in order that each of the parties to the making of a contract may express with exactness his own idea, and may clearly comprehend that of the other, and, to afford conclusive proof of the common understanding, that the art of writing and the expedient of the authentic act are resorted to in such cases.

Upon the subject of the delivery of possession, Mrs. Wells was living upon the property when defendant executed the instrument last above mentioned conveying the title, and she continued to live there until she died, some eight months later, when (her son, C. M. Wells, being her executor, with defendant as

surety on his bond) it was inventoried as belonging to her succession, and the executor remained in possession until the sale to Allen on May 26, 1884, and possibly later. Under such circumstances, there can be no reason why article 2479 of the Civil Code, which reads: "The law considers the tradition or delivery of immovables as always accompanying the public act which transfers the property. Every obstacle which the seller afterwards interposes to prevent the taking of corporeal possession by the buyer is considered a trespass"—should not apply. Lallande v. Lee, 9 Rob. 514; Laurans v. Garnier, 10 Rob. 425; Ellis v. Prevost et al., 13 La. 230; Roe, Wid., v. Heirs of Bundy, 45 La. Ann. 398, 12 South. 759; Lester v. Sheriff et al., 46 La. Ann. 345, 15 South. 4; Jaubert, Tutor, et al. v. Quilter, 48 La. Ann. 244, 19 South. 279.

It is true that it has been held that, where property has been adjudicated at public sales for cash, the delivery of possession does not result from the adjudication, but may be withheld until the cash is paid. Lapene v. Badeaux, 36 La. Ann. 194. And in other cases, if sales are made for cash, the sellers may refuse to deliver until the price is paid, where it was not the intention that the contract should operate as a sale without such payment. "If it can be inferred," says an eminent author, "from the acts of the parties and the circumstances surrounding the transaction, that it was the intent that delivery and payment should be concurrent acts, the title will be deemed to have remained in the vendor until the condition of the payment has been complied with." Benjamin on Sales (Am. Ed.) 330; Kessler & Co. v. Manheim, 114 La. 619, 38 South. 473. In the case now before the court the property which was the subject of the conveyance was immovable, no part of the price was payable in cash, the transferee was in actual possession when the transfer was executed; and it is evident from the terms of the contract, the acts of the parties, and the surrounding circumstances that it was the intention of the parties that the sale should be then and there completed, and that each of the parties to the contract should thereafter hold possession of the property conveyed by the other under the respective titles resulting from such conveyance, together with such other title as either might possess. The proposition that "the purchaser has a right to receive possession only after he has performed all his part of the contract, as by paying the price or settling for the same, as may have been agreed upon between him and the vendor" (as contained in the brief filed on behalf of defendant), has, therefore, no application to the facts presented by the record, since upon the execution of the contract here in question Mrs. Wells had performed her part thereof by assuming the obligation to pay Cullom $1,000 in 30 days, $1,000 in 12 months, and $500 in 18 months, and by ratifying defendant's title and conveying title to the lands described in the instrument.

It is undisputed that defendant specially warranted Mrs. Wells against the Allen mortgage, which he had imposed upon the property conveyed by him. The act reads:

"Warranting title from one to the other against all mortgages or any other incumbrances, whatever, except taxes due on the Wellswood plantation," etc.

It is also undisputed that Allen subsequently foreclosed the mortgage thus warranted against, and bought in the property under an agreement between him and the defendant that he would sell it to the latter for the amount at which it was adjudicated (including costs and attorney's fees), and that, the agreement being complied with, defendant thus acquired a title adverse to that which he had warranted. The common-law doctrine applicable to the situation thus presented is stated as follows:

"It may be laid down as a general proposition that, where the grantor makes a conveyance, containing any of the usual covenants, of lands to which he has a defective title, or no title whatever, and subsequently acquires title thereto, such after-acquired title will inure to the benefit of the grantee. * * * It is a well-settled principle of the common law that, if one conveys real estate with a covenant of general warranty, he cannot be allowed to set up against his grantee, or those claiming under him, any title subsequently acquired, either by purchase or otherwise, and that such new title will inure, by way of estoppel, to the use and benefit of his grantee, his heirs and his assigns." A. & E. Enc. of Law (2d Ed.) pp. 403–405.

And the same rule obtains under the law of this state:

"If A. sells property of which he is not the owner, and he afterwards acquires title, that title vests at once in the vendee." Fenn v. Rils, 9 La. 95; Stokes v. Shackelford, 12 La. 170; Noulen et al. v. Perkins, 3 Rob. 233; Lee v. Ferguson, 5 La. Ann. 533; Barkley v. Succession of Steers, et al., 47 La. Ann. 951, 17 South. 438; Benton and Milliken v. Sentell, 50 La. Ann. 869, 24 South. 297; City of New Orleans v. Riddell, 113 La. 1051, 37 South. 966.

And equally is it true that if A. sells property of which he is the owner, and, it being sold in satisfaction of a debt due by him, he becomes the purchaser, either directly or through mesne conveyance, the title so acquired inures to the benefit of such vendee. The seller is bound to deliver and warrant the thing which he sells. Civ. Code, art. 2477 (2501); Clark v. O'Neal, 13 La. Ann. 381; Jacobs v. Yale and Bowling, 39 La. Ann. 359, 1 South. 822.

It is said that this action is barred by the prescription of ten years, acquirendi causa. The law relied on reads:

"Immovables are prescribed for in ten years when the possessor has been in good faith and held by a just title during that time." Civ. Code, arts. 3474, 3478.

"The possessor in good faith is he who has just reason to believe himself the master of the thing which he possesses, though he may not be, in fact. * * *" Civ. Code, art. 3451.

"The possessor in bad faith is he who possesses as master, but who assumes this quality when he well knows that he has no title to the thing, or that his title is vicious or defective." Civ. Code, art. 3452.

The proposition upon which defendant relies, and must rely, in order to escape the application of this law, is that he did not know that the title acquired by him from Allen inured to the benefit of that which he had conveyed to Mrs. Wells. He was asked, whilst testifying in the case, "Did you consider that you could make a deed, warranting against a mortgage, and then acquire an adverse title to your own deed under that mortgage?" and he answered, "I did." The common-law rule is that ignorance of fact may excuse, but not ignorance of law. Under our system (without going further, it may be said), that error of law cannot be alleged as a means of acquiring property; hence "the error" of law "under which a possessor may be, as to the validity of his title, shall not give him the right to prescribe under it." Civ. Code, art. 1846; Walling's Heirs v. Morefield, 33 La. Ann. 1174; Heirs of Dohan v. Murdock, 41 La. Ann. 494, 6 South. 131; McDade v. Bossier Levee Board, 109 La. 627, 33 South 628.

Defendant pleads estoppel, based upon plaintiffs' alleged abandonment of the property and acquiescence in his (defendant's) possession as owner. The plea is not sustained by the facts. After the death of Mrs. Wells and up to the date of the sale under the Allen mortgage, the property was in the possession of Chas. M. Wells as executor, who resided on the premises, as did also his sister, Mrs. Taylor. When the foreclosure proceedings were instituted, several of the heirs united in an application for an injunction, asserting, as we understand, that they and their co-heirs were the owners of the entire plantation, and, though this application was denied, defendant lived, from that time until June, 1905, within the shadow which this suit, as a coming event, cast before. The heirs (with the exception of defendant's wife), individually or in groups, made repeated attempts, in the meanwhile, to secure the serv-

ices of counsel; but as probably no one in the parish, save the defendant, understood the real situation, as the heirs themselves entertained confused and mistaken ideas as to their rights, as the sisters had no money to spend, and the brothers appear to have been somewhat reluctant to embark upon a sea of family litigation, the case presented but few attractions, and it is not surprising that there was delay in finding an attorney who would take it in charge. It was, however, never abandoned, and the defendant knew that it had not been abandoned. As far back as 1880 he wrote to Gen. (Montford) Wells complaining of a visit that Mrs. Jones and Mrs. Calvit had paid him, and, he says, "disturbed again the quiet of home," and caused him to exclaim, "My God, will troubles never cease," and, testifying as to the subsequent period, he states that he heard of the attempts to employ counsel and of their nonsuccess. He also states that he offered to Mrs. Richardson (now Mrs. Taylor) and to Jeff Wells, as also to Chas. M. Wells, whom he requested to tell the others, to transfer the property to them on their paying the Cullom debt, and, being asked:

"Now, Judge, if you believed that you had a perfect title, in good faith, to the land for which these plaintiffs are now bringing suit, why did you offer, as you say you did frequently, to convey the property now sued for to the heirs if they would pay the Cullom debt?"

—he replied:

"Simply because I wanted them to own some property. I was willing for them to carry out their mother's agreement, and I would have transferred it back to them, If they paid that debt. I would have sold it back."

The testimony so given conflicts with that given by Jeff Wells and Mrs. Taylor, and it does not appear that Chas. M. Wells communicated the offer mentioned to any of his coheirs; the inference which we draw being that, after he had settled with defendant about the 200 acres, the title to which defendant had undertaken to confirm, he did

121 LA.—14

not care to concern himself with the affairs of the others. The payment made by Chas. M. Wells on the Cullom debt should, we think, have been credited to the estate of Mrs. Wells, since, in acquiring the 200 acres from his mother, he had assumed, in part, the payment of that debt, and defendant had no right to be credited with such payment whilst he was also assuming to be the owner of the land of which that was the price. There was, therefore (when the payment in question had been made), but $1,500 due on the Cullom claim, and it would seem reasonable to suppose that if plaintiffs had been informed that they could get say 50 acres of land, worth not less than $10 an acre (now worth $50 or $60 an acre), clear of incumbrances, by paying $1,500, they would have accepted the offer. Another view which suggests itself, in connection with the nonpayment of the Cullom claim is that defendant had warranted the land free of mortgage, and the warranty has never been made good; one mortgage having succeeded another up to the present time. At what period defendant ceased to be willing to transfer the land upon the conditions mentioned, and ceased to want the heirs to "own some property," does not appear. It does appear, however, that they are growing old, and are even more in need than in the past of any property to which they may be entitled. It is alleged that Mrs. Calvit and Mrs. Jones are estopped by the proceedings and judgment in the partition suit brought by them. The pertinent facts in that case are, however, as follows: The action referred to was begun by Mrs. Calvit and Mrs. Jones, who alleged that they were joint owners with defendant and C. M. Wells of the undivided half of the tract which constituted the Wells portion of Wellswood plantation, and, without setting forth the titles or proportionate interests, either of themselves or the parties made defendant, prayed that the property be surveyed and appraised and a

partition thereof ordered. As a matter of fact, the tract in question was that which had been acquired (with other land) by Montford and T. J. Wells from the succession of their father, an undivided half of which, having been given in payment by Montford Wells to Mrs. Jeannette Wells, his wife, had been acquired by defendant and reconveyed to Mrs. Wells, as heretofore stated. The other undivided half, though (apparently) given in payment by T. J. Wells to Martha L. Wells (his wife), was subsequently sold as the property of T. J. Wells, and appears to have been acquired in different proportions by T. C. Manning, J. G. White, M. Ryan, and J. Madison Wells. Prior to the date of the institution of the suit, however, Mrs. Calvit had purchased (but had not paid for) the interest acquired by Manning, Mrs. Jones had become the owner of the interest acquired by White, C. M. Wells had acquired Ryan's interest, and defendant had purchased at sheriff's sale the interest of J. Madison Wells, so that, without reference to the property here in controversy (the undivided half of the tract which had belonged to Montford Wells), the plaintiffs in the partition suit were joint owners with the defendant, and their allegations to that effect could not operate to estop either of them with respect to the matters here at issue; and, that being the situation, Mrs. Calvit was eliminated by a sale for nonpayment of the price of the interest which she had bought from Manning, of which interest Mrs. Jones became the owner. Mrs. Jones, however, filed an amended petition, alleging that the original petition had failed to set forth the respective interests of the parties, and that Mrs. Calvit was no longer concerned in the matter, and further alleging as follows, to wit:

"That Chas. M. Wells is the owner, by purchase from Michael Ryan, of his undivided one-eighth interest (in the undivided half that had been owned originally by T. J. Wells); * * * that Wilbur F. Blackman owns, by purchase at sheriff's sale under an execution against J. Madison Wells, the undivided three-eighths of the said undivided one-half of said property, and also owns the whole of the other one-half by purchase at sheriff's sale from Mrs. Jeannette Wells, * * * and again by purchase from Thomas H. Allen, all of which will be shown by the deeds of conveyance annexed. Now your petitioner shows that, as aforesaid, she owns the one-half of the one-half, or the one-fourth of the whole, of said lands, which, stated in sixteenths, is four-sixteenths of the whole, that Charles M. Wells owns the one-sixteenth of the whole, and that Wilbur F. Blackman owns the eleven-sixteenths of the whole tract."

And, pursuant to a judgment to that effect, the property was partitioned upon the basis of the ownership as thus alleged, to wit: Four-sixteenths of the whole tract to Mrs. Jones, one-sixteenth to C. M. Wells, and eleven-sixteenths to W. F. Blackman.

In view, then, of the fact that she sued for a partition of the whole tract and provoked a judgment, rendered in accordance with the prayer of her petition, recognizing her to be the owner to the extent of four-sixteenths and recognizing Blackman and Wells to be the owners of the remaining interest, it seems clear that she cannot now be heard to say that her interest was greater than she then alleged.

It is said that E. M. Wells is estopped by reason of a certain affidavit made by him. It appears that the affidavit was made in 1892 in order to facilitate the defendant in borrowing on a mortgage upon part of the Hatch Dent portion of Wellswood plantation; the particular tract to be mortgaged not being described in the affidavit or elsewhere in the record. The relevant part of the affidavit reads:

"The place about to be mortgaged * * * is a part and parcel of the original Hatch Dent property, and was inherited by Jeanette D. and Martha L. Wells from their father, Hatch Dent. * * * Jeanette D. Wells and her sister, Martha L. Wells, * * * had undisturbed possession of this property for over 40 years, until their interest was sold and Wilbur F. Blackman purchased the same. No one else has ever claimed or set up title to this property. * * * I have no interest whatever in this matter."

As it does not appear that the affidavit refers to the property here in dispute, it does not operate an estoppel. Nor do we think that, considering the complicated condition of the title to the property sued for, E. M. Wells should· be held to be estopped by the fact that he acted as an expert and appraiser in the partition suit. It has required some effort and patience on the part of this court to understand the facts in regard to the title in controversy, and we have been afforded able assistance. That E. M. Wells did not understand them· (as we think he did not) is, therefore, a matter of no surprise.

It is said that Mrs. Taylor is estopped by reason of the fact that, upon learning of the transfer from Allen to defendant, she moved off the property, where she had been living, and thereby recognized defendant's title. There is nothing in this contention. Mrs. Taylor testifies that she moved off because C. M. Wells threatened to chastise her son and she found it unpleasant to live there. The intervention of John C. Blackman and his brother and sisters (major children of the defendant) is based upon the allegation that, having inherited their mother's (Mrs. Ellen [Wells] Blackman's) interest in Wellswood plantation, they joined their father in selling 100 acres of the property so inherited to one Wilson, and in mortgaging the rest of it to secure a pre-existing community debt, for which, with their father, they gave notes, all of which they did in the belief, superinduced by their knowledge of the situation, combined with the failure of the plaintiffs to assert the title which they now set up, that the property was owned by the pre-existing community between their parents, and that they had inherited an undivided half interest in it. It appears that Mrs. Blackman died in 1897, and if, as we have found to be the fact, the community which had existed between her and her husband had no title to the property here claimed, it is clear that the interveners inherited none. Upon the hypothesis that the community had title, the interveners have a right to be heard for the interest inherited by them; but as to that they are in the same position as the defendant, who represents the community, quoad the community debts, and in considering his defense we have considered theirs. Nor does it make any difference, from that aspect of the situation, that interveners have sold part of the property and mortgaged the rest; nor would it make any difference if the validity of such sale and mortgage were here put at issue, since, having sold and mortgaged the property of another, they would be liable to such other for their acts. "But," say the interveners, "we have borrowed money on this property, and have used it to pay a debt that we and our father owed (being a debt of the late community), which we might not have done if we had not believed that we had inherited a half interest in the property, and we were led into that belief partly by the delay of the plaintiffs in setting up the title now asserted by them." The answer to that argument might, perhaps, be found in what has heretofore been said in this opinion; but we think it premature to enter into a discussion of what the interveners' rights may be in the event it should be held, at some other time and in some other litigation, that the sale and mortgage in which they participated are invalid, or, if held to be valid quoad the vendee and mortgagee, that the interveners are liable for the proceeds. Those questions are not now before us, and a decision upon them will not be too late if rendered when they are presented. There can be no objection, however, to reserving whatever rights the interveners may have in the premises, and that course will be adopted.

Eugene V. Weems intervenes, alleging that he holds a mortgage for $18,600, granted February 9, 1904, by defendant and his major

children on the whole of Wellswood plantation, and, adopting the allegations of the other intervention, he prays that plaintiff's demands be rejected, or that they take the property claimed by them subject to his mortgage. As has been stated, the validity of the mortgage thus declared on has not been put at issue here, and as the debt to secure which it was granted has not yet matured the intervention has nothing to rest on. Moreover, from all appearances, it is amply secured by property which belongs to the mortgagors and is not involved in this controversy. The rights of this intervener, as of the others, will, however, be reserved. The particular land here claimed is identified as being the tract described in the mortgage to Weems as follows, to wit:

"That part of the original Wellswood plantation now known as 'Upper Wellswood,' and upon which the buildings, dwellings, and cabins of the late Gen. Montford Wells now stand, fronting on the left (ascending) bank of Bayou Boeuf, and more particularly described as follows: Beginning at an iron pipe on the bank of Bayou Boeuf, at the southeast corner of said 'Upper Wellswood,' this point being identical with the southwest corner of the plantation of C. M. Wells; thence north to the public road; thence in a northwesterly direction, along the public road, to the east bank of Bayou Boeuf; thence in a southwesterly, southerly, and easterly direction, along the left (descending) bank of Bayou Boeuf, to the place of beginning—containing, in all, 323.76 acres."

The evidence shows that the average rental value, since defendant took possession under the conveyance from Allen, and the average amount received, has been $3.50 an acre. The rule applicable to defendant's right to recover for improvements (by way of set-off to a claim for rents and revenues) is thus stated in a recent case:

"The possessor in bad faith is entitled to recover from the owner of the soil only for those improvements of which the owner may order the removal. He cannot recover for ditching, clearing the land, and other improvements inseparable from the soil." Voiers v. Atkins Bros., 113 La. 303, 36 South. 974; Lisso & Bros. v. Unknown Owner, 114 La. 398, 38 South. 282.

Defendant's right to recover the amounts expended in the preservation of the property is absolute. Civ. Code, art. 2214. We think he should also be allowed to recover, on the same basis, the unpaid balance of the price; i. e., the debt to Cullom, as assumed by Mrs. Wells, less the $1,000 paid by C. M. Wells. His right to recover the amounts expended in improvements depends upon whether plaintiffs elect to retain the improvements or to require their removal. Civ. Code, art. 508; Voiers v. Atkins Bros., supra.

In either case all mortgages and incumbrances resting on the property, save those for taxes, are to be released as a condition precedent to the recovery.

Defendant has expended the following amounts in preserving the property, to wit:

| | |
|---|---|
| In satisfying claim of E. North Cullom | $1,500 00 |
| In payment of taxes (being one-third of total paid from 1884 to 1906, inclusive) | 1,369 96 |
| In keeping dwelling in repair | 1,000 00 |

And the following amounts in improving the property:

| | |
|---|---|
| Building one four-room cabin | $300 00 |
| " four two-room cabins, at $170 each | 680 00 |
| " three houses, on lane, at $125 each | 375 00 |
| " four houses, around bend, at $150 each | 600 00 |
| " one stable and crib | 500 00 |
| " fences | 600 00 |

It is therefore ordered, adjudged, and decreed that, as to the plaintiff Mrs. Elizabeth Jones the judgment appealed from be affirmed, and that as to the plaintiffs Mrs. Martha Cockerille, Ennemon M. Wells, Jeff Wells, Mrs. Jeannette E. Calvit, and Mrs. Anne D. Taylor said judgment be annulled, avoided, and reversed, and that said five plaintiffs last mentioned do now have and recover judgment against the defendant, Wilbur F. Blackman, decreeing them to be the owners, to the extent and in proportions of one undivided eighth to each, of the following described

property, to wit: That part of the original Wellswood plantation, in the parish of Rapides, known as "Upper Wellswood," upon which the buildings, dwellings, and cabins of the late Gen. Montford Wells now stand, fronting to the left (descending) bank of Bayou Boeuf, and more particularly described as follows: Beginning at an iron pipe on the bank of Bayou Boeuf, at the southeast corner of said "Upper Wellswood," this point being identical with the southwest corner of the plantation of Chas. M. Wells; thence north to the public road; thence in a northwesterly direction, along the public road, to the east bank of Bayou Boeuf; thence in a southwesterly, southerly, and easterly direction, along the left (descending) bank of Bayou Boeuf, to the place of the beginning—containing, in all, 323.76 acres. It is further adjudged and decreed that said five plaintiffs recover of said defendant, as rents and revenues of the property so described, and to the extent and in the proportions of one undivided eighth to each, the sum of $1,138.16 for each of the years from July 2, 1884, until the surrender to them of said property, with legal interest upon each of said amounts from the expiration of said years, respectively, less the sum of $1,000, with interest at 8 per cent. per annum from March 23, 1882, and less $500, with interest at 8 per cent. per annum from March 23, 1882, and less the sum of $2,369.96, with legal interest from July 2, 1894; such credit being allowed upon the condition precedent that defendant cause to be erased and canceled all mortgages and incumbrances affecting the property hereinabove described, save such as may relate to unpaid taxes due on said property. It is further adjudged and decreed that, in the event that plaintiffs should elect to retain the improvements placed by defendant upon said property, they shall pay him for the same as follows, to wit: One four-room cabin, $300; four two-room cabins,

$170 each; three houses on lane, $125 each; four houses around the bend, $150 each; stable and crib, $500; fences built by him, $600.

It is further adjudged and decreed that the intervention of John C. Blackman, Wilbur W. Blackman, Mrs. Jeannette D. Ariall, and Mrs. Ellen M. Atkinson, and that of Eugene V. Weems, be dismissed, without prejudice, however, to their rights hereafter, and as occasion may require, to proceed otherwise for the protection of their interests. It is further decreed that the costs incurred by said interveners and by Mrs. Elizabeth Jones, in the district court, be paid by said parties, respectively, and that all other costs of said court be paid by defendant, and that the costs of the appeal be borne in equal proportions by said defendant, interveners, and Mrs. Elizabeth Jones.

### On Rehearing.

BREAUX, C. J. A very earnest application for a rehearing was granted, and a second time the case was heard at length at bar and in brief of respective counsel.

The first complaint on the rehearing in the order of the defense is, substantially, that there is error in basing the decree on lot 1 (which lot was drawn by defendant in a partition, the parties to which were Mrs. Jones, C. M. Wells, and the defendant).

The partition in question was made by the defendant and the others just named several years after he had sold the property in contestation to plaintiff's mother, Mrs. Jeannette Wells. It was also after Thomas H. Allen had conveyed the property to the defendant.

The sale between the defendant and Mrs. Wells, the mortgage given by defendant, and the Allen deed had been recorded in the recorder's office of the parish when the partition was made.

Defendant urged that, if lot 1 of this partition be taken as the basis for the present

judgment, there is necessarily an error to his prejudice by reason of the fact that part and not all of the land in the partition was the same as the land which he had transferred to Mrs. Wells. Some of the land had never been transferred by him to Mrs. Jeannette Wells.

In order so far as possible to avoid complications because of the multifariousness of the facts, it has been deemed proper to take in the first place for foundation of the decree the land described in the sale to Mrs. Jeannette Wells.

It is the same land described in the petition here and claimed in this suit.

In a limited way we adopt a deductive process in arriving at our conclusion, as follows:

There is no dispute as relates to the Hatch Dent land, frequently mentioned in the argument. It measures 700 acres. They must be deducted, as they are not included in the description.

Mrs. Jeannette Wells, a month or two after the sale made to her by defendant of certain lands in the year 1882, sold 200 acres to C. M. Wells.

It is part of the history of the case that this sale to C. M. Wells was ratified by defendant in the year 1888.

The consideration of the sale has been mentioned in the original opinion, and will not be again mentioned.

The contention at this point is that the defendant sold the whole of the Wellswood tract to Mrs. Jeannette Wells, or, at any rate, that by the partition before mentioned defendant became the owner of an entire tract, and that it follows that plaintiff is entitled to the whole of lot 1.

We do not find it possible to agree with that contention, for in our opinion defendant sold to her one-half of the tract, and not the whole. The one-half stated in the description relates to every part of the whole. The sale was of an undivided half.

The remainder of the paragraph in the description does not change the first portion of the paragraph.

A close reading of the description of the property sold by defendant to Mrs. Jeannette Wells shows that the last figures just stated, to wit, 550 acres, to be the whole measure, refers to all the land sold, taking the description as a whole, and does not specially and exclusively refer to Wellswood plantation. Altogether the defendant sold that number; i. e., the number was in the whole of the property, but cannot be contained in the undivided one-half of present Upper Wellswood.

But the contention is that we should take the partition made in the year 1884 as the basis.

That contention is not sustained by the pleadings.

Plaintiffs brought suit on the deed of defendant to Mrs. Jeannette Wells. The plaintiffs can gain nothing by the partition, because their rights arose previous to it and were not in any way affected by it.

That being the case, we must go back to the original sale in our search for the number of acres sold.

It consisted of the undivided half of Wellswood plantation. That was the interest sold by defendant to Mrs. Jeannette Wells. The record governs, and not the hasty utterances of a witness, the defendant, who disclaims that he intended any other land than that described in the deed, and says that his reference to the land in testifying was the merest oversight—a slip. The facts and circumstances sustain that statement.

Mrs. Jeannette Wells went into possession of the land as owner under the terms of the deed. She remained in possession, and at her death the undivided half of Wellswood plantation was appraised and included in

the inventory of her estate as part of her property.

The sale under which Mrs. Wells held has every appearance of a binding contract. It remained unquestioned for many years.

There were, doubtless, equitable or family considerations exerting an influence in allowing the status quo and not disturbing the vendee in her possession. But they, whatever they were, cannot prevail against the binding terms and conditions of the deed in question.

In reference to the asserted resolutory condition:

It is urged on the rehearing that, the price not having been paid, the resolutory condition should be enforced.

The original consideration was $2,500.

It was held heretofore that $1,000 had been paid on account. There is considerable controversy upon the subject of this amount. Heretofore the court decided that it had been properly paid and gave the vendee credit.

We have found no reason to change the decree in this respect. It follows that the resolutory condition cannot be enforced; part of the price having been paid and no offer made to return the amount paid.

Moreover, it does not occur to us that in these proceedings the resolutory condition, as to its enforcement, presents an issue which can possibly be maintained.

Another contention pressed on the rehearing was that the vendee must first elect to accept title subsequently acquired, and that inuring does not take place before acceptance of the title.

It is true that the grantor cannot compel the grantee to take a new title against his will; but the new title, none the less, inures to the grantee, and cannot be used against his will so as to oust the latter from his possession of the property. No title is acquired which can possibly be exercised against the grantee's will.

It follows that the Allen title, under which defendant claims to own, was not a new title, conferring upon him the right to retain the property; for the heirs of the buyer claimed the benefit of the warranty clause and claimed the subsequently acquired title.

The Louisiana Supreme Court· in repeated decisions decided that the paramount title inures by operation of law.

It is in place to state that under both systems, the common law and the civil law, direct effect is given to the warranty clause.

Under the French civil law it is provided that the warranty is bound to permit nothing from which eviction or trouble to the warrantee results. Répertoire du Droit Français Carpentier, vol. 23, p. 147.

In the common-law states and in Louisiana the title passes to the warrantee. Am. & Eng. Ency. of Law, vol. 11, p. 418.

This court held in substance in Fenn v. Rils, 9 La. 99, that the debtor does not get rid of an incumbrance on the property who acquires a new title. The title inures to the benefit of the vendee. The character of the previous title or possession is not changed by the adjudication.

From the earliest date of the Louisiana jurisprudence to this date the line of decisions is continuous.

Now as relates to our decree: It is ordered, adjudged, and decreed that it be amended so as to give to plaintiffs the five-eighths of the undivided half of the tract of land therein described, and the five-eighths of $569.08, being the half of the rent heretofore allowed for each of the years from July 2, 1884, until the surrender to them of said property, with legal interest upon each of said amounts from the expirations of said years respectively, less the sum of five-eighths of $1,000, with interest on said sum

at 8 per cent. per annum from March 3, 1882, and less five-eighths of $500 with interest on said sum at 8 per cent. per annum from March 3, 1882, and less five-eighths of the sum of $1,184.98, being (the said $1,184.- 98) half the amount allowed in our former decree for taxes and keeping dwelling repaired, with legal interest from July 2, 1894.

As relates to the improvements: Each item of improvement allowed is reduced by one-half: One four-room cabin, five-eighths of $150; four two-room cabins, five-eighths of $85 each; three houses on lane, less five-eighths of $62.50 each; four houses around the bend, five-eighths of $75 each; stable and crib, less five-eighths of $250; fence built by him, less five-eighths of $300.

It is further ordered, adjudged, and decreed that the rights of the heirs of the late Mrs. Wm. F. Blackman, under the will of the late Mrs. Jeannette Wells, if any they have, are reserved. With these amendments our former decree is reinstated and made the judgment of the court.

MONROE, J., adheres to the views expressed in the original opinion, and dissents from this opinion and decree, save in so far as they conform thereto.